First National Bank of Fort Scott, Appellant, v. Simpson et al.

Division Two, December 12, 1899.

1. **Demurrer to Evidence**: EXTENT OF ADMISSION. The effect of a demurrer to plaintiff's evidence, in either an equity or law case, is to admit every material fact to be true which the evidence tends to prove, as well as every reasonable inference deducible therefrom.

2. ———: ———: COMPETENT EVIDENCE EXCLUDED. The effect of a demurrer to plaintiff's evidence in an equity case is, also, that, if legal and competent evidence was offered at the trial and excluded, and incorporated in the bill of exceptions, such excluded evidence may be considered on appeal.

3. **Married Woman**: GIFT FROM HUSBAND: SEPARATE PROPERTY. Where a husband is free from debt he may give his wife all his property, and when the gift is without fraudulent intent as to his subsequent creditors, it becomes to all intents and purposes her separate property. And the same is true if he be in debt at the time of the gift, if he have a sufficient amount of property left to satisfy all his debts.

4. ———: ———: ———: STOCKS AND REAL ESTATE. Mining stock and residence property given a wife by her husband, if he was solvent at the time, unless made with an intent to defraud his subsequent creditors, become her separate property, as much so as if they had been purchased by her with moneys of her own which she possessed before marriage.

5. ———: GIFT FROM OTHERS: SEPARATE ESTATE: WAIVER. Where stocks and bonds issued by a company were given to a married woman, in lieu of services rendered the company by her husband, at a time when he was solvent, and he handled them and collected the dividends and interest thereon for her, and applied the money as she directed, but did not otherwise reduce them to his possession, but both she and he always treated them as her separate property, with which she did as she pleased, it will be held that he waived any marital rights he had thereto, and that as between himself and those claiming through him said property was her separate estate.

6. ———: ———: ———: ———: LIFE INSURANCE POLICIES: CREDI-
TOR'S BILL. And where such married woman, through him as her
manager or agent, uses a part of the money derived from such
separate property (whether it was given to her by her husband at a
time when he was solvent, or by a third party) to pay premiums of
life insurance policies issued on his life for her and her children's
benefit, the proceeds of such policies can not be subjected to the
payment of his debts, whether such debts were made before or after
the issuance of the policies.

*Appeal from Jackson Circuit Court.*—HON. BEN T.
HARDIN, Special Judge.

AFFIRMED.

JOHN BURGIN and SHELLEY GROVER for appellant.

(1)   A demurrer to evidence in an equity case, as well as
at law, concedes every fact which the evidence tends to prove,
and every inference fairly deducible from the evidence.
Healey v. Simpson, 113 Mo. 340; Leeper v. Bates,
85 Mo. 224; Baker v. Sutterfield, 43 Mo. App.
591; Patton v. Bragg, 113 Mo. 600; Seitz v. Mitch-
ell, 94 U. S. 19.   (2)   When testimony presented on the
record was excluded in the trial court, it may be admitted and
considered by the Supreme Court.   Hanna v. South St. Jo.
Land Co., 126 Mo. 1; Goodrich v. Harrison, 130 Mo. 263;
Radley v. Neill, 134 Mo. 364; Baxter v. Donnell, 69 Mo.
App. 588.   (3)   Transactions between husband and wife
must be closely scrutinized when they come in conflict with
the claims of creditors.   Holloway v. Holloway, 103 Mo.
274; Benne v. Schnecko, 100 Mo. 250; New South B. & L.
Ass'n Co. v. Reed, 31 S. E. Rep. 514.   (4)   Payments made
by a debtor, of premiums upon a policy of life insurance upon
his own life for the benefit of his wife, or for the benefit of
wife and children, are voluntary gifts and conveyances to the
beneficiary, and are conclusively, fraudulent and void as
against creditors existing at the time of such payment.   Mer-

chants & Miners Co. v. Boreland, 52 N. J. Eq. 282; Tolcott
v. Field, 24 Neb. 612; Houston v. Maddox, 73 Ill. App. 203;
Pullis v. Robinson, 73 Mo. 201; s. c., 5 Mo. App. 508; Schon-
dler v. Wace, 1 Camp. 487; Skarf v. Soulby, 1 Mecn. & G.
364; Jenkyn v. Vaughan, 3 Drew, 419; Stokes v. Cowan, 29
Beav. 637; Freeman v. Pope, 9 L. R. Eq. 206; Toylor v.
Coenen, 1 Chan. Div. 636. (5) A voluntary conveyance
by a debtor to his wife is, as against prior creditors, presump-
tively fraudulent. To render a voluntary conveyance by a
husband to his wife valid as against prior creditors, the burden
of proof is on the grantee to show that the debtor retained
sufficient funds and property to pay his debts. A gift by a
husband to his wife stands condemned as fraudulent unless
the wife shows by clear evidence that the husband retained
ample means to meet his debts. The wife must show that
her husband was solvent. Hoffman v. Nolte, 127 Mo. 120;
Crook v. Tull, 111 Mo. 289; Loehr v. Murphy, 45 Mo. App.
524; Sloan v. Torry, 78 Mo. 625; Seitz v. Mitchell, 94 U. S.
179; Jordan v. Buschmeyer, 97 Mo. 97; Patten v. Casey, 57
Mo. 118; Bradford's Appeal, 29 Pa. St. 515. (6) Where
property is acquired in the name of a wife during coverture,
the presumption of law is that it was paid for by the husband.
The burden is on the wife to show clearly and beyond a rea-
sonable doubt that she acquired it with her separate means.
In the absence of such clear evidence the presumption that it
was paid for with the husband's means (which is in all cases
a violent presumption of fact, almost conclusive) must prevail.
And the above rule of evidence has not been changed or
altered or affected in any way by the passage of the Married
Women's Act. Sloan v. Torry, 78 Mo. 625; Seitz v. Mitchell,
94 U. S. 179; Jordan v. Buschmeyer, 79 Mo. 79; McFerran
v. McKinney, 22 Mo. App. 554; Patton v. Bragg, 113 Mo.
601; Bucks v. Moore, 36 Mo. App. 536; Hoffman v. Nolte,
127 Mo. 120; Gamber v. Gamber, 18 Pa. St. 366. (7) The
possession of a married woman is the possession of the hus-

band. Property or money in the possession of a married woman is presumptively the property and money of the husband, and this is a violent presumption, and the married woman must produce the clearest proof to overcome this presumption. Walker v. Reamy, 36 Pa. St. 410; Walker v. Walker, 25 Mo. 376; Loehr v. Murphy, 45 Mo. App. 524; McFerran v. Kinney, 22 Mo. App. 558. (8) It is not necessary to show that one is insolvent at the time of making a voluntary conveyance in order to render it void as to existing creditors. Potter v. McDonald, 31 Mo. 73; State to use v. Lourie, 1 Mo. App. 378; Bump on Fraud. Conv. (3 Ed.), p. 289; Hastings v. Crossland, 13 Mo. App. 597; R. S. 1889, sec. 5170; Gabriel v. Mullin, 111 Mo. 125; Keady v. White, 168 Ill. 82. (9) Under the Missouri statute, no more than $500 per annum in premiums on life insurance on the life of the husband for the benefit of the wife can be paid out of the means of the husband with impunity against the husband's creditors. When the premiums paid in any year out of the funds or property of the husband exceed $500, the excess of premiums over $500, with interest thereon, inure to the benefit of the husband's creditors. R. S. 1889, sec. 5851; Pullis v. Robison, 5 Mo. App. 548; s. c. 73 Mo. 201. (10) The Married Woman's Act of 1875, R. S. 1889, section 6869, giving to married women separate estates in certain personal property, does not apply to marriages which occurred prior to 1875. Leete v. Bank, 115 Mo. 184; Leete v. Bank, 141 Mo. 584.

SCARRITT, VAUGHAN, GRIFFITH & JONES and JOHNSON & LUCAS for respondents.

(1) Where upon the whole record it is clearly manifest that the judgment is for the right party, it will not be reversed, though error was committed at the trial. State ex rel. v. Jones, 131 Mo. 194. (a) In the trial of an equity case,

though it may appear that incompetent evidence was admitted in the hearing of issues submitted to a jury, yet if it can be seen from all the evidence that the decree rendered thereon by the court was right, it will be affirmed in the appellate court. Harlan v. Moore, 132 Mo. 489. (b) Though the court may have erred in the ground of its decision, still if the judgment was for the right party it should not be reversed. Wolfe v. Dyer, 95 Mo. 545; Bradford v. Emerson, 56 Mo. App. 379. (c) The decree will be affirmed if it appears from the entire record to have been correct, though errors may have been committed on the trial. Estes v. Fry, 94 Mo. 266. (d) Though evidence offered by the appellant was erroneously excluded, this would not justify a reversal unless, in the judgment of this court, if it had been admitted it would have changed the result even in a law case. Spiva v. Coal Co., 88 Mo. 68; Wilkerson v. Allen, 67 Mo. 502. (2) There can be no question that on the facts the trial court found that there was no evidence that George E. Simpson paid the premiums on the policies in question, and hence that the plaintiff failed to prove the issues tendered by the bill and the same were paid by the defendant, and rendered judgment because of such finding. (a) Much deference is given to the findings of the trial court on account of its superior advantage for weighing the evidence and judging of the credibility of the witnesses. Parker v. Roberts, 116 Mo. 657; Snell v. Harrison, 83 Mo. 652. (3) Both at common law and under the statutes Mary E. Simpson was the owner of the property used in the payment of the premiums in controversy. (4) George E. Simpson waived any marital rights he might have had at common law in the property of his wife. White v. Clasby, 101 Mo. 162; Roberts v. Walker, 101 Mo. 597; Boynton v. Miller, 144 Mo. 687; Holthaus v. Hornbostle, 60 Mo. 439; McCoy v. Hyatt, 80 Mo. 130; Botts v. Gooch, 97 Mo. 88. (5) And by such waiver invested her property with the character of a sole and separate estate which a court of equity will recognize

and protect.   Walker v. Walker, 25 Mo. 367; Holthaus v.
Hornbostle, 60 Mo. 439; McCoy v. Hyatt, 80 Mo. 130.
Long and uninterrupted control over it with the acquiescence
of her husband is evidence thereof.   Coughlin v. Ryan, 43
Mo. 99; Welch v. Welch, 63 Mo. 57; Botts v. Gooch, 97 Mo.
88.   (6)   If Simpson had borrowed the money from his wife
with the understanding it was to be repaid, he will in equity
be regarded as her debtor, and she is entitled to the same pro-
tection as any other creditor.   Clark v. Clark, 86 Mo. 114;
Seay v. Hesse, 123 Mo. 451; Bean v. Patterson, 122 U. S.
500.   (7)   The personal property under the statute was the
separate estate of the defendant.   R. S. 1889, sec. 6869;
Laws 1875, p. 61; Winn v. Riley, 52 S. W. Rep. 27; Al-
bridge v. Muirhead, 101 U. S. 397.

BURGESS, J.—This is an equitable proceeding by plain-
tiff, a judgment creditor of George E. Simpson, deceased, who
was the husband of the defendant, Mary E. Simpson, against
her and her co-defendants, in the nature of a creditor's bill,
to subject to the payment of its debt .$4,848.48, being the
amount of two judgments rendered in favor of plaintiff against
the firm of Donnell, Lawson & Simpson in the circuit court of
the city of New York, in October, 1886, and interest thereon,
which were allowed by the probate court of Jackson county,
Missouri, in favor of plaintiff against the estate of said George
E. Simpson, deceased, on the fourth day of September, 1893,
a sufficient amount of money for that purpose, out of $61,000,
alleged to have been received by Mrs. Simpson on eight differ-
ent policies of life insurance on the life of said George E.
Simpson, issued in her favor, and turned over by her to her
co-defendants as trustees for her, the premiums on all of which
are alleged to have been paid by him, when he was insolvent,
in fraud of his creditors, in which Mary E. participated.

The policies are of the dates, companies and amounts as follows:

| | |
|---|---:|
| September 1, 1863, Manhattan Life Insurance Company | $ 5,000 |
| June 3, 1873, Equitable Life Assurance Society. | 5,000 |
| August, 1874, Connecticut Mutual Life Insurance Company | 10,000 |
| December 10, 1883, Penn Mutual Life Insurance Company | 10,000 |
| April 30, 1881, Equitable Life Assurance Society.. | 1,000 |
| February 28, 1884, Providence Savings Life Assurance Society of New York | 10,000 |
| December 7, 1886, New York Life Insurance Company | 10,000 |
| December 7, 1886, New York Life Insurance Company | 10,000 |
| Total | $61,000 |

George E. Simpson died April 11, 1893, insolvent. He left a will which was admitted to probate in the probate court of Jackson county, Missouri, by which Mary E. Simpson is made sole legatee. She qualified as executrix under the will, but no property or money came to her as said executrix.

The answer admits the issuance of the policies of insurance, and the receipt of the sum of fifty-nine thousand dollars thereon, and avers that other creditors, prior in point of time to the plaintiff, having demands against George E. Simpson aggregating more than twenty thousand dollars, instituted and had suits pending against her therefor. It avers that she was a creditor of Donnell, Lawson & Simpson in the sum of $15,816.66, and prayed that if it be found that George E. Simpson had paid any premiums in excess of five hundred dollars per annum, that the same be applied to the payment of her debt, and denied every other allegation in the petition.

The answer of Frank Simpson and Frank Groves was a general denial. The reply was a denial of the new matter set up in the answer of Mrs. Simpson.

The facts as disclosed by the record are about as follows:

The defendant Mary E. Simpson, and her husband, George E. Simpson, moved from the State of Missouri where they formerly resided to the city of New York in 1862, where they resided until 1871, when they moved to New Jersey, and lived there until the latter part of the year 1892 or the early part of 1893, when they moved back to Jackson county, Missouri, where George E. Simpson died, as before stated.

George E. Simpson prospered in business from 1858, the time of his marriage, up to 1889, unless it was from 1884 to 1889. From 1863 to 1871 he was connected with Northrup & Chick and Kearney & Simpson, and from 1871 to 1889, with Donnell, Lawson & Company, and Donnell, Lawson & Simpson.

On the fourteenth day of May, 1884, the firm of Donnell, Lawson & Simpson made an assignment for the benefit of their creditors, but by the consent of their creditors, their assets were returned to them, and they resumed, and continued business until 1889, when they were forced to suspend business. At the time of their assignment their total assets, not including their respective personal estates, inventoried $5,792,187.31, while their liabilities amounted to $3,641,216.64. The private estate of George E. Simpson was at that time of the estimated value of $110,259, with a liability of $2,500.

In October, 1886, two judgments were rendered in the circuit court of the city of New York in favor of plaintiff and against the firm of Donnell, Lawson & Simpson, for the aggregate amount of $3,438.64, which were allowed as a demand in favor of plaintiff, and against the estate of George E. Simpson, by the probate court of Jackson county, Missouri, on the fourth day of September, 1893, for the total sum of $4,848.48, no part of which has ever been paid.

The defendant Mary E. Simpson was made a witness by plaintiff and testified substantially as follows:

"We bought a home in Orange, New Jersey, in 1880;

my husband bought the home; I don't know what the value
of the home was, but my husband did not own that property
at the time of his death; my husband built a home in East
Orange in 1880; I would say that the property I referred to
in Orange was not my husband's, but belonged to me; my
father's name was James Sinnett Young; I had some money
at the time I was married, but can't say that it was as much
as $500; did not get any means from my father's or mother's
estate after marriage; our home in Orange was a comfortable
home; the cost of it, about $20,000; I sold it since we came
west, some months before my husband's death; when the home
in Orange was purchased the title to it was taken in my name;
the entire place, house and lot, cost my husband $20,000; we
sold it for about $35,000; I can't say what the means I pos-
sessed at marriage consisted of; I had some little money; I
can't say it was as much as $250; in 1862 we moved to New
York City; I received as a gift from the National Water-
works Company four hundred shares National Waterworks
stock; it was given to me by the waterworks company; I don't
know what officer of the company gave it to me; my husband
was at the time an officer of the company, and he rendered
services for the company as a consideration for the gift; the
value of that stock was $40,000; I sold $20,000 worth of the
stock; I don't remember what year, and I received a hundred
dollars a share; the money was turned over to me probably
about 1887; the sale was affected by my husband; he man-
aged and controlled it for me; the proceeds of the sale of this
stock were deposited in bank, but I could not say what bank;
it was deposited to my credit; I could not say what bank; I
had accounts with the National Bank of the Republic and
with the Orange Bank, but I don't say that it was deposited
in either of those banks; and I don't remember that I carried
an account in any other bank; Mr. Simpson was a director in
the National Bank of the Republic; the remaining two hun-
dred shares of National Waterworks stock I now own; I don't

know that this waterworks stock was ever transferred on the books of the corporation to me, or that they ever stood in my name; I received $10,000 waterworks bonds from my husband about the same time I received the stock before mentioned in 1872 or 1873, and I sold those bonds about 1887 and they bore 6 per cent interest; interest was paid on those bonds about three years; it was paid to me; I don't remember whether by cash or by check, and it was deposited in my name, I can't say what bank; I remember of having received each payment of interest and I don't know how many payments there were; I can not tell what use the money was put to; some of it was spent in household expenses; some of it went to pay premiums on this life insurance; I sold the bonds about 1887 and received for them about $10,000; I do not know and could not say what premiums of life insurance and to what companies were paid premiums out of this fund; since 1884 I have paid all the premiums on the policies for life insurance of my husband. Q. Why do you fix that date? A. It was necessary that I should pay them if they were paid. Q. What do you mean when you say that it was necessary for you to pay them? A. The year 1884 Donnell, Lawson & Simpson suspended—Mr. Simpson's means were tied up and it was necessary that I should make these payments. Q. Was it necessary, Mrs. Simpson, for you to make these payments in order that you might obtain the life insurance upon your husband free from the claims of creditors of your husband; is that what you mean? A. It was necessary that I should pay these premiums in order that I might retain the life insurance for myself and children. Q. And this was your reason for beginning to pay this life insurance in 1884, was it? A. It was; I paid the premiums on the policies after 1884; I received dividends on the National Waterworks stock; I can't say how many, and I do not know how those dividends were received by me, or what were the amounts of the dividends; nor do I remember through whom I

received the dividends; I think I received about $5,000 dividends on stock. It may have been less; I do not remember when; I think some time after 1884; I do not know in what bank the $5,000 was deposited. I could not say who deposited these dividends for me. They were deposited in bank to my credit. This money was checked out of the bank, I guess by me. I do not remember of signing the checks. It may have been drawn out in cash. I do not know who collected these dividends from the National Waterworks, nor do I know who deposited it for me—whether George E. Simpson, my husband, deposited it or not. My husband attended to most of my business affairs. I could not tell the precise use this money was put to; some of it may have been used to pay premiums on life insurance. My husband gave me some mining stock; I can not tell what stock, nor where the mines were located, but I had them about 1880. I don't know how many there were. I do not know what kind of mining stock it was. They were sold; I do not know just when, but before 1880. I do not know who purchased the stock. My husband managed these stocks, but I can not say whether or not he sold them. I know nothing about the sale of these stocks. I don't know who collected the proceeds of the sale, nor how much the stock was sold for, nor whether it was a dividend paying stock. I got some money from these investments. It may have been $3,000, more or less. I don't know who paid this money to me. I could not say what became of th's particular money; some of it was used in the premiums on life insurance policies; how much I can not say; what premiums were paid with it I can not say; nor can I say to what insurance companies, nor whether it was paid by check or cash, nor in what year it was deposited, nor can I say in what bank, nor do I remember that I drew the checks. I had a note of $5,000. I had the rent on my place in Orange for four months in the summer of 1884. I borrowed from my son Frank $3,500 and $1,500 from other children. I borrowed

$10,000 on my place in Orange. I had ten shares stock in
the National Bank of Republic and $625 in the sale of my
horses and conveyances in Orange. Since 1884 I had $1,800
interest on waterworks bonds. The $5,000 was made by
Lambourne & Gray; $4,000 was paid on that note to me. I
bought the note; don't remember of whom; paid $5,000;
don't remember when I got the money with which to buy note
from sale of mining stock and from accumulated interest on
bonds. I wish to add that I had $4,200 in cash. I can not
say how much proceeds of mining stock went for purchase of
Lambourne & Gray note; don't know whether I paid the note
in cash. My husband bought the note for me and paid for it
with my money, but I don't know in what bank my money
was; nor do I know who drew it out, nor would I say the note
was turned over to me personally. Mr. Simpson attended to my
affairs. I don't know how long the note run; $4,000 was paid
on the money and deposited in the bank, but I don't know what
bank, nor just how much was deposited. Some portion of this
$4,000 was used for the payment of premiums on life insur-
ance; I can not tell how much nor what premiums were paid
with it, or to what companies, or whether paid out by check
or whether paid by my husband; nor by whom it was paid.
In 1887, 1888, 1889 and 1890 I received about $3,500 from
my son; I don't remember in what amounts, or whether re-
ceived in cash or by check, or what use was made of the money.
Some of it was used in paying premiums on life insurance;
don't remember to what company. My husband may have
attended to the paying of premiums. My reason for saying
that I paid them is because these various moneys which were
mine—I want to state that a little differently—as
these premiums were paid my means grew less—
knowing that the payment of these premiums exhausted my
means from time to time, I think it was sufficient reason—I
know these moneys were so used—because I do know it. I
may have given it to my husband; my son took no receipt or

note for the $3,500. I received $1,500 from the younger children in June, 1888; I don't know how it was paid to me, whether in cash or by check; I don't remember in what bank it was deposited; a part of it may have paid some of these premiums; it was put in with my other moneys. My husband may have attended to the payment of these premiums. My husband attended to my business, but I did not expect him to furnish the money with which to pay the premiums. I do not remember that Mr. Simpson always attended to the payment of these premiums. I received $625 from sale of horses and carriage in 1888, prior to our removal to Kansas City. I do not remember to what use this money was put. I had some stock in National Bank of Republic, of which I became possessed in 1880 or 1881; my husband gave me this stock; we disposed of it shortly before coming west in 1892 for about $1,400. My husband was a director in the National Bank of the Republic; I don't know when he resigned, and I don't know that I ever received any dividends on this stock. I had $4,200 in cash which came to me from some investments—accumulated intesest on waterworks bonds; I kept this money in the National Bank of the Republic. I received four months' rent from my house in Orange in 1884; $350 per month while I was absent at Ocean Beach. I began paying premiums on my husband's life insurance in 1884; prior to that time I do not remember who paid the premiums; I furnished the money to pay the premiums on the Penn Mutual Life Insurance policy in 1884; but I do not remember how I paid it; I may have directed my husband to pay it; I do not remember making the payment on same policy in 1885, but I can say that I furnished the money with which to pay it to my husband and may have given him check or money; that I furnished the money is clear, but to whom I can not say; I do not remember whether it was paid in cash or by check. I paid the premium on the same policy in 1886; I gave the money to my husband to pay this premium either by check

or cash, I don't know which; I paid the premiums on same policy in 1887, but I don't remember through whom—whether my husband paid it or whether it was paid in check or in cash; my husband looked after payment of these premiums for me. This money paid on these premiums came from my moneys, but I could not say where my moneys were kept. I make the same statement about the premiums on same policy in 1888 and 1889 and 1890, 1891 and 1892. My husband died April 11, 1893. My son paid the premium in 1892 on the Penn Mutual; received death loss from the Penn Mutual, but I don't know how much; I collected in all $59,000; this $59,000 has been invested by my son for me; I signed the papers, receipts to the insurance companies when the money was paid. My husband carried $20,000 life insurance with the New York Life Insurance Company, taken out in 1886, and the annual premiums since paid on the same was $1,140; I furnished the money to pay the annual premium; as to how I furnished it, I do not just remember; my husband attended to the payment of this; I do not just remember the date, but the time was such as was acceptable to the company; I think my husband may have paid it at my request; the annual premium was $1,140, I do not just remember about the payment of the premium for 1887, but I paid the premium; I do not know how, when or who paid the premium which fell due December 7, 1887; that is, I do not remember this; I think they were paid by my checks; I don't remember whether I drew the check myself, but I remember that this premium was paid by me because I do; I do not know where the check is; I think my husband sent the check to the company; I do not remember the amount of the check; I make the same statement about the premium for 1888; the premium for 1889 was paid by me, but I do not remember whether by check or in money; I did not see the money paid to the company and I don't know that I saw a check; the money may have been given to Mr. Simpson; the premium for 1890, I think, was

paid by my notes; I attended to none of these matters myself and I can not answer. My husband had authority to draw and sign such notes for me, and the note may have been drawn by Mr. Simpson; I do not remember signing the note myself. The premium that fell due in 1891 was paid by my check on the National Bank of the Republic; I did not send a check to the company; I do not know whether my husband did or not; I do not know how those checks were sent to the company; I do not know whether those checks have been returned to me or not. The premiums which fell due in 1892 were paid by my checks against National Bank of Kansas City; I do not remember the date and I do not know whether or not they were paid to the office in Kansas City; I do not remember seeing the check; the death loss under these policies has been paid. The $5,000 policy in the Manhattan Life Insurance Company on the life of my husband; I can give no definite information about the payment of the premiums on the same except to say the money was taken from my personal property to pay it; I can not say who paid the premiums on the same prior to 1884; I paid them since 1884; I can not say that I paid the premium for 1883; the premium for 1884 I think I paid, but I can not enter into the details or how or by whom, but of one thing I am quite sure, that I paid the premium; I do not remember to whom I furnished the money, nor do I remember what the amount paid was; I do not remember whether my husband attended to the paying; my reasons for beginning to pay these premiums in 1884 were that because for a few months the firm of Donnell, Lawson & Simpson suspended, their means were tied up, and these policies were taken out for me, and I had the means to pay them with; I thought it was right I should do so; I do not remember that I paid any premiums on the Manhattan policy in cash to the company, nor that I drew a check in the payment of any particular premium; I do not remember any particular premiums paid by check drawn by me; on the policy in the Connecticut

Mutual I think I began paying the premiums in 1884; I could not remember all these years; I might add, sometimes I might have had the means and paid some of them; I would like to speak of these premiums generally, including this one; as these premiums were paid year after year my estate grew smaller. I do not remember that I sent a check by mail to the company; I am unable to state just how the company received the premiums; I do not remember the amount of the premiums for 1885, and I do not remember when the premium for 1886 was paid; I paid the premium for 1886, but I do not remember whether the money was deposited in bank or not; the premiums may have been paid by my husband, or some man or boy from his office; I don't remember any circumstances connected with the payment of this premium, and I make the same answer with reference to the 1887 premium on same policy, and same answer with reference to the 1888 and 1889 premium; those premiums were paid with my money; I do not know in just what form the money was paid, whether in cash or by check; the premiums for 1890 and 1891 were also paid with my money, but I don't remember anything about the details—as to whether they were paid in cash or by check, or who attended to the payment; and the same is true as to the premium for 1892. There were two policies on my husband's life in the Equitable Life Assurance Society, aggregating $6,000; I furnished the money to pay the premiums on that policy—I either attended to it myself or had my husband do so; I don't remember taking the checks to any one. The policies on my husband's life in the Provident Savings Life was for $10,000, and I have paid the premiums on that policy since 1884, and I don't remember anything more definite about the payment of these premiums than on the other policies. My husband died in April, 1893; my husband was insolvent at the time of his death; he left a will in which he devised his property, real and personal, to me; I have received nothing under his will, but I received $59,000 insur-

ance money; I have been appointed executrix of the estate of George E. Simpson, deceased, by the probate coun of Jackson county, Missouri; I received no property under the will of George E. Simpson; I do not remember just what year my husband became insolvent; the firm of Donnell, Lawson & Simpson suspended in 1884; I don't know what their liabilities were; my husband left no property of any kind at his death; the amount of premiums on life insurance carried by my husband prior to 1886, when the New York Life policies were taken out, I think was about $600; Donnell, Lawson & Simpson, in 1887, borrowed $15,815.66 of me; I got the money from the National Bank of Republic and lent it to them; I don't remember whether I lent it to them all at once or at different times; I took no note from Donnell, Lawson & Simpson for the money when I lent it to them."

Frank Simpson a witness for plaintiff testified that $49,000 of the insurance money passed through his hands, and that the other $10,000 was paid in somewhat later. That he received it, and that a portion of it "somewhere in the neighborhood of $40,000," was invested, and a portion of it went to pay some debts and expenses of various kinds that his mother owed. That his mother was the owner of four hundred shares of waterworks stock which he had seen time and again and handled. That his father was largely interested in forming a new board, and in organizing the National Waterworks Company which was a good deal of trouble and they gave his (witness's) mother then four hundred shares of stock in payment, or rather part payment for his services.

That was all the evidence of any importance that was offered.

Defendant then asked an instruction in the nature of a demurrer to the evidence, which was given, and in accordance therewith jugment rendered for defendant, from which plaintiff after unsuccessful motion for a new trial appeals.

This evidence shows very clearly that Mrs. Simpson had ample separate means of her own with which to pay all the premiums on the policies, and that they were either paid by her husband, George E. Simpson, with his own means when solvent, or by her in person or through him, with her separate means after he became insolvent.   She had a small amount of money at the time of her marriage, how much is uncertain. Her husband gave her a house and lot in Orange, New Jersey which she sold for about $37,000, the sale being made subject to incumbrances, and netting her $28,000 at a time when the financial straits of her husband required the premiums on the policies to be paid by her in order to take care of the insurance for the benefit of the family.

She had given to her in 1872 or 1873, four hundred shares in National Waterworks stock of the par value of $40,000, about $20,000 of which she still owned at the time of the trial.   She sold the balance of this stock in 1887 or 1888, for $100 per share.   About the same time that this stock was presented to her, her husband gave her $10,000 in waterworks bonds, bearing six per cent interest, the interest on which was paid to her until about 1887, when she sold them. Besides these moneys, she had some mining stock, from which she realized about $3,000; a note, which she bought, on Lambourne & Gray for $5,000, upon which she collected $4,000; the rent of the Orange property for four months in 1884; $3,500 borrowed from her son Frank Simpson, and $1,500 from her other children; $10,000 which she borrowed on her Orange property; ten shares of stock in the National Bank of the Republic upon which she realized $1,400, and $625 derived from the sale of her horses and conveyance in Orange.

She was not contradicted in any way, with respect to the way, time when and where she acquired these properties and moneys, or the payment of the premiums, and, unless under the facts shown, the property and moneys were in fact her husband's the plaintiff is not entitled to recover in this case.

It may be conceded that the effect of a demurrer when interposed to plaintiff's evidence in either an equity or law case, is to admit every material fact to be true which the evidence tends to prove, as well as every reasonable inference to be deducible therefrom (Healey v. Simpson, 113 Mo. 340; Leeper v. Bates, 85 Mo. 224; Patton v. Bragg, 113 Mo. loc. cit. 600; Seitz v. Mitchell, 94 U. S. 580), as well, also, that when legal and competent testimony is shown to have been offered upon the trial of an equity case and excluded which is incorporated in the bill of exceptions, so that the Supreme Court can pass upon it, it may be considered on appeal or writ of error. [Hanna v. South St. Joseph Land Co., 126 Mo. 1; Goodrick v. Harrison, 130 Mo. 263].

It is claimed by plaintiff that notwithstanding Mrs. Simpson may have in fact commenced the payment of the premiums on the policies of insurance in 1884, that the policies were nothing more nor less than property acquired during coverture, and in the absence of proof that they were paid with her separate funds, should be so held. But the evidence does show that prior to 1880 while George E. Simpson was solvent he gave to his wife certain mining stock, and in the same year a residence property in Orange, New Jersey, valued at $20,000, subject to an incumbrance of $9,000, and that the waterworks company gave her certain bonds from which after her husband became insolvent Mrs. Simpson raised the money with which to pay the premiums on these policies.

Where a husband is free from debt he may give his wife any or all of his property, and when done without fraudulent intent as to subsequent purchasers, it becomes to all intents and purposes her separate property. Or even if the husband be in debt at the time of the gift, if he have a sufficient amount of property left to satisfy all of his debts it will not be held fraudulent. [Wells' Separate Property of Married Women (2 Ed.), sec. 93.]

In Botts v. Gooch, 97 Mo. loc. cit. 90, it is said: "By

the common law, the marriage vests in the husband the personal property of the wife then owned or thereafter acquired by her, and of which he obtains possession; and in general her possession is his possession. But according to the doctrine of courts of equity she has a separate existence from her husband, and having such separate existence, she may have the possession and ownership of property separate from her husband. Hence it is that gifts from the husband directly to the wife will, in many cases, be upheld in equity."

By the gifts of George E. Simpson to his wife of the mining stock, and the property in Orange, New Jersey, the same become her separate property, as much so as if the stock and property had been purchased by her with moneys of her own which she possessed before her marriage. So with respect to the waterworks stock. While it appears that it was given to Mrs. Simpson by the waterworks company the same rule applies as to its character, and the rights of Mrs. Simpson thereto, as do with respect to the property given directly by her husband. [Welch, Adm'r, v. Welch, 63 Mo. 57.]

The position assumed by plaintiff that payments made by a debtor of premiums upon a policy of life insurance upon his own life for the benefit of his wife, or for the benefit of his wife and children, are voluntarily gifts and conveyances to the beneficiary, and are conclusively fraudulent and void as against creditors existing at the time of such payments seems to be well settled law, as the authorities cited by plaintiff abundantly show. But the evidence in this case does not, we think, justify the assumption that the premiums were paid by the assured. Mrs. Simpson had acquired by gift from the waterworks company four hundred shares of its stock, the ownership of which by her was never questioned until the institution of this suit, but was fully recognized, and treated by her husband as her separate property. That those bonds were her separate property and so recognized and treated by her husband was emphasized by the fact that in 1884 the

banking firm of which he was a member loaned to her a large sum of money thereon, taking them as collateral security. As to this stock and the Orange City property she clearly had a separate estate.

There was no evidence tending to show that these bonds were ever reduced to the possession of George E. Simpson. Upon the contrary, they and the real estate were always treated by him and Mrs. Simpson as her separate property with which she did as she pleased, by reason of which he waived any marital rights he had, and as between himself and those claiming through him, said property was her separate estate.

In Roberts v. Walker, 101 Mo. loc. cit. 601, it is said: "It may now be accepted as settled law in this State that a husband, by agreement with his wife and a uniform course of conduct during marriage toward her chattel property, may (as between themselves and those in privity with them) invest such property with the character of a sole and separate equitable estate which a court of equity will recognize and protect." To the same effect are White v. Clasby, 101 Mo. 162; Boynton v. Miller, 144 Mo. 681; McCoy v. Hyatt, 80 Mo. 130; Walker v. Walker, 25 Mo. 367; Holthaus v. Hornbostle, 60 Mo. 439.

In the case last cited the husband of Mrs. Holthaus was insolvent and her step-father purchased a bakery and put her in possession of it, whereupon she employed her husband to assist in its management. A creditor of the husband levied an execution upon the bakery, claiming that under the common law property acquired by the wife during coverture enured to the benefit of the husband, and became liable for his debts, and that her possession was his, but the Supreme Court held that though the property was in possession of the husband he would be held to be a mere trustee for his wife, and that with respect to her personal property her separate title thereto might be established by acts, conduct and words, as any other fact *in pais*.

So in Welch v. Welch, *supra*, and Coughlin v. Ryan, 43 Mo. 99, the principle is announced that the separate property interest in the wife may be shown by her long and uninterrupted control over it, without interference with or claim of ownership upon the part of her husband. [Botts v. Gooch, *supra*; Bank v. Winn, 132 Mo. 86; White v. Clasby, 101 Mo. 167; Roberts v. Walker, *supra*.]

So it has been held that where a husband "instead of asserting his claim, as husband, to his wife's moneys, borrows the same with the agreement and understanding that it is to be repaid or accounted for to her, he will, in equity, be regarded as her debtor." [Clark v. Clark, 86 Mo. 114.]

With a due regard to that rule which requires that transactions between the husband and wife should be closely scrutinized when they come in conflict with the claims of creditors, for the reason that such relations afford a convenient cover for fraudulent transactions, and to protect the property of the debtor from his creditors, and that when property is acquired in the name of the wife during coverture the presumption will be indulged that it was paid for by the husband, and that this doctrine applies to the insurance policies involved in this litigation, and that the burden rested upon Mrs. Simpson to show that she paid the premiums thereon with her own separate means, the evidence we think clearly overcomes this presumption, as well also as of any suspicions of fraud that might arise from the relation of the parties, and showed beyond any question that she paid all the premiums with her own separate means and was not guilty of any fraud in any transaction involved in this case. In this conclusion we are in harmony with the finding of the trial court to which we usually defer in a large measure under such circumstances.

There are other questions argued by counsel in their briefs, but as the conclusion reached necessarily results in an affirmance of the judgment, we deem it unnecessary to pass upon them. GANTT, P. J., concurs; SHERWOOD, J., absent.