# PHELAN, Respondent, v. GRANITE BITUMINOUS PAVING COMPANY, Appellant.

### St. Louis Court of Appeals, November 28, 1905.

1. **RECTUS: Prima Facie Case.** In determining the propriety of an instruction in the nature of a demurrer to the evidence, the court should take the most favorable view of the plaintiff's case which is warranted by the evidence and every reasonable inference therefrom.

2. **NEGLIGENCE: Frightening Horse: Prima Facie Case.** In an action for injuries caused to plaintiff on account of the horse which he was driving becoming frightened at a steam roller in the street, where the evidence tended to show that the engineer in charge of the roller saw the plaintiff's wagon as it approached, before the horse became frightened, could have stopped the noise of the machine in a moment, but continued to sound the whistle and permit the puffing of steam after he saw the horse was frightened, had become unmanageable and was running away, the plaintiff made out a prima facie case for the jury.

3. ———: ———: **Instruction.** In such an action, an instruction which authorized a recovery upon the finding of defendant's negligence in operating his steam roller with "unusual puffing and whistling noises" was open to criticism in the absence of any evidence that the puffing was unusual; but where the defendant's evidence shows that there was no whistle on the engine, and that it was never necessary to use a whistle on it, and any whistling that may have taken place was unusual, the defendant could not have been prejudiced by the expression; the two noises together were unusual and the jury were not required to separate them and ascertain which was the unusual noise.

4. ———: ———: ———: **Last Chance.** And in such case, an instruction applying the last-chance rule was proper.

5. ———: ———: ———: **Reasonable Care.** And where an instruction was given embodying the last-chance rule, but requiring of the defendant "the exercise of reasonable exertion on his part," it was not erroneous where the context of the instruction showed the expression meant the exercise of reasonable care.

6. ———: ———: ———: **Omitting Issue.** And in such case, where the evidence of defendant tended to show that the horse became frightened by colliding with a sprinkling cart which was in the street, instead of by the engine, it was error to authorize a recovery without submitting that issue to the jury.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Percy Werner* for appellant.

(1) No actionable negligence on the part of defendant was shown. (a) Defendant owed to plaintiff no duty which it failed to perform toward him. Atherton v. Coal & Coke Co., 106 Mo. App. 591, 81 S. W. 223; Barry v. Cemetery Ass'n, 106 Mo. App. 358, 362, 80 S. W. 709; Glaser v. Rothschild, 106 Mo. App. 418, 424, 80 S. W. 332; Pueschell v. Kansas City Wire & Iron Works, 79 Mo. App. 459, 462; Gurley v. Railroad, 104 Mo. 211, 223, 16 S. W. 11; Roddy v. Railroad, 104 Mo. 234, 244, 15. S. W. 1112; (b) There was no evidence in the case tending to show that the steam roller in question was managed otherwise than in the usual and ordinary way. The city of St. Louis would not have been liable to plaintiff under the circumstances shown, and there is no ground for holding the defendant liable. Sparr v. St. Louis, 4 Mo. App. 572. Hicks v. Railroad, 46 Mo. App. 304; Lane v. Lewiston, 91 Maine 292; Dist. of Columbia v. Moulton, 182 U. S. 576; Cairncross v. Pewaukee, 78 Wis. 66, 71. (2) Plaintiff, by adopting the route which led through Laclede avenue, when other routes, equally convenient, were open to him, assumed all the risks of the consequences which might result from driving past the steam roller. Gilbert v. Railroad, 128 Fed. 529; Hurst v. Railroad, 163 Mo. 311, 63 S. W. 695. As to the assumption of risk, see Jamison v. Continental Casualty Co., 104 Mo. App. 306, 313, 78 S. W. 812; Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 579, 580, 77 S. W. 314; Junior v. Missouri Elec. Light & P. Co., 127 Mo. 79, 29 S. W. 988.

*Claud D. Hall* for respondent.

(1) There was sufficient evidence to go to the jury. It was prima facie negligence for the engineer to discharge sudden jets of steam and whistle as plaintiff approached, driving his horse. Brown v. Railroad, 39 Mo. App. 192; Stamm v. Railroad, 1 Abb. Cases 438; Flynn v. Railroad, 169 Mass. 305; Rodgers v. Railroad, 150 Ind. 397; Railroad v. Barnett, 59 Pa. 259; Hanlon v. Phila. & West Chester Turnpike Road Co., 182 Pa. 115; Lightcap v. Phila. Traction Co., 60 Fed. 212; Bennett v. Lovell, 12 R. I. 167. (2) It was the engineer's duty to stop the steam roller and the noise, when he saw or might have seen that plaintiff was being placed in a position of peril. Oates v. Railroad, 168 Mo. 535, 68 S. W. 906; Ellis v. Railroad, 160 Mass. 350-351; Galesburg Electric Motor & Power Co. v. Manville, 61 Ill. App. 492; Benjamin v. Railroad, 160 Mass. 4, 5; Brown v. Railroad, 89 App. 196. (3) The phrase, by the "exercise of reasonable exertion," in plaintiff's instruction was proper. It required the engineer to do what he reasonably could to stop the roller and its noises. It was such exertion as reasonable care demanded. Moore v. Railroad, 126 Mo. 265, 29 S. W. 9.

STATEMENT.—In the months of September and October, 1904, the defendant, under a contract with the city of St. Louis, was engaged in reconstructing Laclede avenue in said city, by putting down a concrete foundation, surfaced with bituminous macadam. There is a double street railway track in the center of Laclede avenue. The distance from the outside rails of the tracks to the curb is fifteen feet on either side. On October third the north side of the avenue had been reconstructed and was open for traffic, and the defendant was at work on the south side, in block thirty-seven hundred west, spreading the bituminous macadam and compressing it with a nine ton steam roller. The macadam is in

a lumpy state and at a very high temperature when spread and must be rolled before it cools. After smoothing it down with a roller, a coat of crushed granite is spread over it and then forced into the bituminous preparation by running a roller back and forth over it many times. Defendant had dumped a pile of crushed granite at or near the curb on the north side of the avenue and about opposite where its roller was in operation. A gravel sprinkling cart was standing by this pile of granite. The cart is described as a two-wheeled vehicle with shafts like a baby buggy, and a sheet-iron funnel in the center for containing and distributing crushed granite. Plaintiff was a driver of a one-horse laundry wagon. On the morning of October third he turned from Grand avenue into Laclede avenue and drove west on the south side of the street until he came near the steam roller operating on the south side of the tracks. Plaintiff's horse was frightened, presumably, by the noise made by the steam engine, became unmanageable, lunged forward, ran the wagon over the gravel cart and the pile of crushed granite onto the curb and upset it. The horse fell on the street, plaintiff went over with the wagon and in falling struck his eye against the curb or some projecting sharp object bursting the eyeball. For the loss of his eye plaintiff recovered a judgment for thirty-seven hundred dollars. The defendant appealed.

The allegations of negligence are that the defendant "so carelessly, negligently and recklessly managed and conducted the said steam street roller that the same scared the horse which was hitched to the wagon and which was being driven by the plaintiff, and the said horse was caused to shy and run away into the curb and into a box of street paving material next to the curb on the north side of said Laclede avenue, at said point, whereby the plaintiff was violently thrown from his wagon to the street and curb, and was thereby severely injured.

Plaintiff says that "the defendant's said agents and servants in charge of said steam street roller knew and saw, or by the exercise of reasonable care, could have known and seen, that the plaintiff's horse was being scared by the running and unusual puffing and frightening noises of the steam street roller and that plaintiff's horse was about to run away, and that plaintiff was being placed in a position of peril, in time for the defendant's said agents and servants to stop or check the running of said steam roller and check its unusual puffing and frightening noises, and thereby prevent the plaintiff's horse from frightening and running away and the injuries to the plaintiff. But the defendant's said agents and servants in charge of said steam street roller did nevertheless, carelessly, negligently and recklessly run and operate said steam street roller at an unusual speed and with unusual and frightening noise, whereby plaintiff's horse was scared and ran away, and plaintiff was injured as aforesaid."

The answer was a general denial with the plea of contributory negligence put at issue by a reply.

The evidence is that the steam roller weighed nine tons; that it traveled, when in operation, at a speed of about three miles per hour and could be stopped almost instantaneously; that it was run back and forth over the bituminous preparation spread upon the concrete foundation for the purpose of compressing it; that the engineer in charge of the steam roller saw the plaintiff coming when he was two or three hundred feet east of him.

Plaintiff testified that he had been driving the horse for four years, around street cars, locomotives and engines; that he had never experienced any trouble with him, and that the horse was perfectly gentle and had never scared; that the horse was blind in one eye and the sight of the other was defective, but he could see fifteen or twenty feet. Plaintiff stated he saw the steam roller when he reached Spring avenue, a distance of

about one hundred and fifty feet from the roller, and that he could have turned north on Spring avenue and driven a block north, then turned west and by driving one block west and a block south could have driven around the roller and reached his place of destination— forty hundred Laclede avenue—but he did not do this, for the reason he did not anticipate his horse would be frightened by the steam roller. Plaintiff further testified as follows:

"When I passed Spring avenue this engine started to blow off and made several loud puffs and blew its whistle; blew its whistle two or three times. I was then within forty feet of it, on the north side of the car tracks. The engine had not moved prior to that. When I approached that point it was standing still. When I got within forty feet of it, I heard these whistles and this very rapid puffing. It was very loud.

"Then the engine started up, running back and forth, kind of catercornered. It was headed west. It would run a little bit forward and then a little bit back. At the time I heard these successive whistles and this noise, it was running toward me; that is, toward the east. I was going west. It was running in a northeasterly direction. The engine was facing the horse and was running toward the east. The first thing my horse did when this whistling took place was to rear on his hind feet, and give one rear then another one, and keep on that way. I tried to control him by pulling on the line and sawing on his mouth. This rearing and jumping continued about two or three minutes. I yelled at the horse to quiet him.

"Then I ran into a box filled with gravel that was on wheels. I ran over the axle. It was on the north side of the street, the side I was on. It was a gravel box they used to spread gravel over the street. The box itself was wood; it had a kind of sheet-iron funnel. Besides that there was a tar box there and also a pile of gravel. The box was out in the street about five feet

from the curb. These were almost directly opposite the engine.

"After the horse ran me into this box, the next thing I struck was a pile of gravel, and by that time he hit the curb and my wagon turned over and threw me out, and the horse was lying sprawling on the sidewalk. I hit my eye on the curb and knocked it out. While I was struggling to manage my horse, I heard further puffing. The puffing did not stop at all. It did not stop until after I had left; after I had picked myself up. It had stopped at that time.

"After my horse was scared, I did not see them do anything to stop the roller making the noise. After I was thrown out, I got myself from under the wagon and went to the drug store on the corner. The employees in charge of the roller did not assist me. No one assisted me. After I had gotten a part of the way to the drug store, a gentleman came up and assisted me up on the step, and he went on. I do not know who he was. The drug store was on the corner of Spring and Laclede. Dr. Miller operates it. Nothing was done there except to bathe the eye and tie it up. The eyeball was split open, it was running out on my cheek, and the druggist bound it up as well as possible, and a gentleman came in and assisted me over to the Rebecca Hospital. I was in the hospital a week, where they dressed my eye, sewed it up and put it back in with the hope of saving it, and left it there for a while."

In regard to the whistling and puffing of the engine and the distance plaintiff was from it while the noise was going on, plaintiff was corroborated by Mrs. John Henning and Lotetta McCoy, who witnessed the casualty.

Defendant showed by several witnesses that there was no whistle on the steam roller and that there never had been one on it.

A. J. Taussig, a city street inspector, testified that

he was present and witnessed the accident, in respect to which he stated:

"I was standing between the roller and this wagon; the wagon was going west on the north track. I noticed that this horse was trotting slowly. It was down grade. The roller was puffing, but not puffing a bit more than it did ordinarily in going up the hill. The horse and wagon were about twenty-five or thirty feet from the roller, when they veered around to the right toward the north curb. The screening pile extended about four feet from the curb, and on the west end was this small screening cart, which was about as high as that rail from this platform, and about four feet square on the top, with handles projecting about two feet, like baby buggy handles. That was on the west side of the screening pile, right alongside the cart. There were several colored men there shoveling screens into this cart, and their backs were toward the east. They were facing, shoveling west into this cart. When they heard this racket of the wheels of the wagon pulling off from the car track, the noise a wagon will make when it does that, they turned around and looked. The horse was just beginning to trot rapidly. They yelled at the man, because it looked as though he was going right over them. Instead of that, the wagon hit this screening cart and knocked it over. It was a wooden cart, but it had a sheet-iron cylinder or cone-shaped device on the inside to give a flaring motion to the screenings as they fell from the cart. It made a considerable racket. The horse must have hit the curb just about that time, as he was so close.

"As I was watching the motion of the horse, I saw the wagon go over. I saw the front wheels of the wagon apparently skid along, or slide along, there at the curb. There was only one way, with the slow speed, that the wagon could possibly have gone over, and that was by hitting a little raised place in the curb, which it did;

because I examined the place carefully afterwards, and I found that a small corner or a joint of the curb was broken. The wagon was upset; it was not broken in any way, was not scratched. . . .

"The gentleman who was driving the wagon apparently fell out of it, not with a great deal of force, not enough to tear his clothing or to injure him, except in his eye. His eye was punctured. But there was no apparent abrasion of the eyelid or eyebrow or of any other part of his face. I noticed some particles of sticks and two small guides by which a tree box had been supported; two little metal pieces sticking out of the ground. The tree box was no longer there. They were just about the right size and length to cause this accident, running into his eye. That is what I saw. The horse had not pulled loose from the wagon. The harness was not broken across the breast-yoke. The horse had scarcely hit a pace that could be called a gallop up to the time he hit the screening cart. He was not apparently frightened, excepting the noise had disturbed him. The horse, according to my examination, was practically blind."

Taussig was corroborated by defendant's superintendent of the work, S. R. Murray.

Peter F. Murray testified as follows:

"I was engineer on the street roller, and saw the accident. I was rolling the finishing coat of the pavement, consisting of this dry granite screenings, and I had been rolling continuously for about three-fourths of an hour previous to that time, back and forth, sometimes about one hundred and fifty and sometimes two hundred feet, sometimes more, sometimes less, compressing that part of the pavement. I was running the roller east up the south side of Laclede avenue, standing face to the north, as a person with a roller would, facing to the north and looking east. As I was running east, I saw this laundry wagon in the west-bound car track. As the horse approached the roller, he pulled out

of the track. I did not notice the driver particularly, because the horse did not appear—or was not excited. He pulled out of the track, increased his pace slightly, and ran down through the pile of screenings and hit the handles of the screenings cart. The horse was not running away until he hit the handles of the screenings cart, and then he gave a couple of plunges, and I stopped the roller instantly then, as the roller could be stopped instantly. I got down off the roller during this instant or part of a minute; and the horse ran down against the curb and pulled the wagon. It turned over and the horse fell down. .The screenings cart was tipped over, and I was down off the roller and went, immediately ran, over to that place and assisted the driver of the wagon out from under the wagon, partly assisted him out. The foreman and I walked up there. I walked a part of the way to the drug store with the man. He was holding his eye with both hands, and crying out, 'My eye, my eye!' He (the foreman) took him in the drug store, and after that I got on my roller and went ahead."

Witness also testified that the puffing of his engine was just as it always is when the roller is in operation.

BLAND, P. J. (after stating the facts).—1. At the close of all the evidence the defendant moved the court to instruct that under the law and the evidence plaintiff was not entitled to recover. The refusal to grant this instruction is assigned as error. The instruction was in the nature of a demurrer to the evidence and the plaintiff should have the most favorable view of his case that the evidence warrants and every reasonable inference therefrom. [Pope v. Railway, 99 Mo. 400; 12 S. W. 891; Larson v. Railway, 110 Mo. 234; 19 S. W. 416; City of St. Louis v. Railway, 114 Mo. 13; 21 S. W. 202; Young v.. Webb City, 150 Mo. 333, 51 S. W. 709; Bank v. Simpson, 152 Mo. 638, 54 S. W. 506;

Roe v. Adams, 80 Mo. App. 198.] By giving the plaintiff the most favorable view of his case, it appears that the engine in charge of the steam roller saw the plaintiff's wagon as it approached from the east, before the horse became frightened, and had the wagon in view until it was overturned; that he could have stopped the noise of the whistle and the puffing of the engine in a moment, but instead of doing this continued to sound the whistle and permit the puffing of the steam, after he saw the horse was frightened, had become unmanageable and was running away, and that the plaintiff was in a perilous position. This being true, the engineer was negligent in failing to cease blowing the whistle and in failing to stop the engine after he saw the plaintiff was in a position of peril. [Oates v. Railway, 168 Mo. 535, 68 S. W. 906; Brown v. Railway, 89 Mo. App. l. c. 196, and cases cited.] We think the demurrer to the evidence was properly overruled.

2. The defendant assigns as error the giving of the following instruction:

"1. The court instructs you that, if you find from the evidence, that plaintiff was driving a one-horse wagon at the place mentioned in the evidence, and that the agent of the defendant in charge of a certain steam roller, mentioned in the evidence, negligently ran and operated the said steam roller with unusual puffing and whistling noises, that the horse of the plaintiff, as a result of the puffing and whistling of said steam street roller, became unmanageable and placed plaintiff in a position of peril, and said horse ran away and caused the injuries to plaintiff complained of, and you further find from the evidence that the agent of the defendant, in charge of and operating said steam roller, saw the plaintiff's horse was becoming frightened at said steam street roller and noises, and was becoming unmanageable, and that the plaintiff was being placed in a position of peril, in time to have stopped or checked the run-

ning of said steam street roller and stopped or checked the puffing and noises of said steam street roller, and prevented the plaintiff's horse from becoming unmanageable and running away and the injuries to plaintiff complained of, by the exercise of reasonable exertion on his part, and you further find that he negligently failed to perform this duty, then defendant, was guilty of negligence, and, if you find that plaintiff's injuries were caused by the said negligence of defendant, then your verdict should be for the plaintiff, unless you further find from the evidence that there was negligence on plaintiff's part directly contributing to the injuries sustained by him."

One of the objections to the instruction is that it uses the word "unusual" in such connection with the puffing and whistling as to indicate to the jury that the puffing was unusual, while there is no testimony that it was so. This criticism is just, for there is not a syllable of evidence that the puffing was unusual or that the noise therefrom was greater than at any other time when the engine was in operation. But we do not see how the defendant could have been prejudiced by this slip in the instruction. According to the defendant's evidence, there was no whistle on the engine and it was never necessary to use a whistle on this character of machine. Therefore, the whistling that took place, if it did take place, was not only unusual but wholly unnecessary, and if the horse took fright from the unnecessary noise made by the whistle combined with the usual noise made by the puffing, neither the court nor the jury were required to separate the two noises and ascertain whether the fright of the horse was caused by the usual or unusual noise or by both. Whether the noise of the whistle alone, or it combined with the noise of the escaping steam, caused the fright of the horse, his fright is attributable to the negligence of the engineer. The instruction placed a greater burden on the plaintiff than he was required to bear; for this the defendant is in no position to complain. The

following further criticisms are made of the instruction:

"3. The instruction sets forth a number of distinct acts and omissions, and then concludes with the statement 'if you further find that he (the engineer) negligently failed to perform this duty,' thus leaving the jury to draw its own inference as to which particular the words 'this duty' apply to.

"4. The use of the phrase 'by the exercise of reasonable exertion on his part' is erroneous; it should have said 'by the exercise of reasonable care on his part.'

"5. The instruction ignores the other causes which might very well have been the primary cause of the accident, viz.: the loose left line, and the pile of gravel and the screenings cart."

The instruction proceeds upon the theory that if the engineer saw the horse was frightened by the noise of the engine and that plaintiff was in a position of peril, it was the engineer's duty to stop the noise. The instruction correctly stated the humanitarian or last fair chance doctrine, which we think is applicable to the facts of the case as shown by the evidence. [Gates v. Railway, supra.] The phrase, "by the exercise of reasonable exertion on his part," from the context of the instruction, means by the exercise of reasonable care, and could not have been understood differently by the jury. All the evidence shows that the wagon ran upon the cart and the gravel pile; the plaintiff's that the horse became frightened and in his fright ran over the cart and gravel pile. The defendant's evidence tends to show that the horse was not frightened until the wagon struck the gravel cart and that it was the collision with the cart that frightened the horse, and that the collision was caused by the careless driving of the plaintiff. This evidence raised an issue of fact, that is, whether the horse was frightened and caused to run away by the noise made by the steam roller or whether he was frightened by the wagon colliding with the sprinkling cart and the gravel pile. If the fright was caused by the latter, the defend-

ant is not liable; therefore, the issue was a material one. It was entirely ignored by the instruction. This was error. [Clark v. Hammerle, 27 Mo. 55; Sawyer et al. v. Railroad, 37 Mo. 240; State v. McKinzie, 102 Mo. 620, 15 S. W. 149; Lafayette County Bank v. Metcalf, 29 Mo. App. 384; Griffith v. Railway, 45 Mo. App. 574; Schaaf v. Fries, 77 Mo. App. 346; Galbreath v. Carnes, 91 Mo. App. 512.] The defendant asked an instruction (No. 2 refused) which, if it had been given, might have supplied the omission and prevented a reversal of the judgment. This particular issue was not submitted to the jury, for which error the judgment must be reversed.

Other errors are assigned but as the judgment must be reversed and the cause remanded for a retrial on account of the error in the first instruction given for plaintiff, we deem it unnecessary to take up the other assignments of error as these alleged errors may not occur on a retrial of the cause.

The judgment is reversed and the cause remanded. All concur.