# HARRY TROLL, Public Administrator, Appellant, v. MARY O. SPENCER et al., Executors.

### Division One, November 29, 1911.

1. **DEMURRER: In Equity Case.** A demurrer to the evidence at the close of plaintiff's case in an equity proceeding is an anomaly, and not good practice. Instructions of any character fill no office in an equity case, and are out of place, and no error can be predicated upon the giving or refusing of them.

2. **——: ——: Sustained: No Exception.** If the demurrer to the evidence in an equity case is sustained and the bill dismissed, the case on appeal will be considered on its merits, though no exception to the court's ruling on the demurrer was saved, if plaintiff filed a motion for a new trial, challenging the judgment as being for the wrong party, inequitable and contrary to the evidence, and saves an exception when that motion is overruled.

3. **RESCISSION: Settlement: Fraud: Misrepresentation: Accounting.** Where the executrix of deceased's will made a full settlement with a brokerage firm for all claims and demands she had against them and assigned her interest in the unclosed option deal to them, a rescission of that executed contract of sale, based upon alleged false representations made to her, who was ignorant of the truth and who relied upon them, cannot be allowed if no witness testifies to any false representation or deception, or to any facts from which either could be inferred; and without a right to rescission there is no right to a further accounting.

4. **——: ——: ——: ——: Deception: Book Accounts: In Pencil and Ink.** Whether or not the fact that the books of the brokerage firm were partly in pencil and partly in ink throws a suspicion on the integrity of those books and calls for an explanation, if the executrix saw those books and long before she made a contract of sale of her testator's interest in the account she, through her attorney, assisted by expert friends, examined them, and with that knowledge executed the contract of settlement and sale, she was not deceived thereby. Knowledge prevents deception. Equity extends her right hand to the deceived and wronged, but she does not proceed in a revengeful or whimsical mood in ripping up executed contracts.

238 Sup.—6

5. ——: Option Deal: Cards With Numerals: Possession Prima Facie Evidence of Ownership. The fact that "cards," bearing numeral captions, and figures, words and signs pointing to option deals through a brokerage firm, issued by a board of trade, and issued in that form to conceal the identity of the dealer from outsiders, were found in the possession of the dealer after his death, does not of itself show prima facie that he owned the whole of the account indicated by the numerals, since such cards, in and of themselves, are colorless and neutral as to the fact of ownership and *quantum* of interest. At most they only furnish a clew leading up to a discovery of the facts in the books where the account was kept under the respective numerals as a heading, and they must° be interpreted by the books; and if the books rebut several ownership in the dealer, and his testatrix, with full knowledge of the books, obtained by an examination of them by herself, her attorney and expert friends, settled with the broker on the basis that her husband was the owner of only one-third of the account, instead of sole owner of the whole, there is no deception, and no room for a rescission.

6. ——: ——: Fiduciary Relation: Settlement. Even were it true that the relation existing between a broker and his customer is a confidential one, fiduciary in character, and that the broker carries the burden of showing his dealings with his customer were fair, yet the broker discharges that burden when, with full knowledge on the part of the customer of the state of the account, he makes a full settlement with him and enters into a solemn contract importing such settlement.

7. FRAUD: Proof: Suspicion: Option Deal. Fraud is never conjectured. It is not permitted to rest on mere suspicion. There must be facts from which it may be inferred. Small things may show it, if, when put together in their natural relation, they point indubitably to it. He who asserts it must prove it; and while it may be difficult to prove it, that difficulty does not dispense with the necessity of proof. And in investigating charges of fraud, courts of equity, as do courts of law, assume men, even though they be brokers and their customers, dealing in options, are honest and act from correct motives, until the contrary is shown.

Appeal from St. Louis Circuit Court.—*Hon. Jas. E. Withrow,* Judge.

AFFIRMED.

*Schnurmacher & Rassieur* for appellant.

(1)   A court of equity will at the instance of one party to a contract, set aside such transaction or contract if it was made upon the misrepresentation or fraud actual or constructive of the other.   Steinmeyer v. Siebert, 190 Pa. St. 471; Winter v. Bullock, 6 Ga. 230; Morris v. Budlong, 16 Hun, 570.   (2)   A confidential relationship exists between a broker and his customer, and the broker in settling with his customer should make the fullest disclosure.   Slight fraud under such circumstances will justify a court of equity in setting aside the transaction based upon it.   Morris v. Budlong, 16 Hun, 570; Phillips v. Beldon, 2 Edwards's Chancery 1; Steinmeyer v. Siebert, 90 Pa. St. 471.   (3)   Where the consideration for a release or an assignment given is so inadequate that the conscience of the court is shocked or where the consideration is grossly inadequate and there are some other circumstances which place the party giving up his rights on the inadequate consideration at a disadvantage, then a court of equity will relieve the aggrieved party of such contract and set the same aside. Holmes v. Fresh, 9 Mo. 200; Railroad v. Brown, 43 Mo. 294; Nelson v. Betts, 21 Mo. App. 219; Cannon v. Gilmer, 33 South. 659.   (4)   Courts of equity have in some cases refused to set aside the contracts or settlement agreements between principal and agent or customer and broker, and allow the agreements to stand, but nevertheless compel the broker or the agent to account for the additional moneys due.   Moses v. Noble, 5 South. 181; Phillips v. Beldon, 2 Edwards's Chancery 1; Farnum v. Bruce, 26 Mass. 212.   (5) A demurrer to evidence is not known in equity and cannot be offered or interposed.

*Boyle & Priest* and *T. E. Francis* for respondents.

(1) Where, in an equity case, the evidence adduced for the plaintiff does not make out a prima facie case, it is proper for the court to sustain a demurrer to the evidence. Anthony v. Bldg. Co., 188 Mo. 704; Bank v. Simpson, 152 Mo. 638. (2) The action of the trial court in sustaining a demurrer to the evidence and dismissing plaintiff's bill is not open to review, because no exception was saved to that ruling. Haniford v. Kansas City, 103 Mo. 172; Harrison v. Bank, 9 Mo. 161; Carter v. O'Neil, 102 Mo. App. 391. This rule aplies to cases of equitable cognizance. Swearingen v. Newman, 4 Mo. 456; Cook v. Davis, 4 Mo. 622. (3) There was no evidence tending to prove that plaintiff's testate owned any other or greater interest in account No. 35 than that for which the settlement was made, and the charge of fraud was, therefore, unproved and the judgment dismissing the bill was correct, since fraud must be proved, not conjectured, and facts that give rise only to a suspicion of its existence do not establish it. Kilpatrick v. Wiley, 197 Mo. 123; Priest v. Way, 87 Mo. 16; South Missouri Lumber Co. v. Crommer, 202 Mo. 504; Funkhouser v. Lay, 78 Mo. 458; Garesche v. MacDonald, 103 Mo. 1; Rumbolds v. Parr, 51 Mo. 592; Webb v. Darby, 94 Mo. 621. (4) The evidence establishes that all the facts that are relied upon in this case to prove that plaintiff's testate owned all of account No. 35 were known to the executrix at the time the settlement was made. If these facts are sufficient now to warrant an inference that misrepresentations were made concerning the ownership of said account, they were sufficient then to apprise said executrix that she ought not to act upon the representations, and plaintiff, therefore, was not entitled to recover. 20 Cyc. 32; Anderson v. McPike, 86 Mo. 293. (5) The evidence establishes that the agent who made the settlement for the Tay-

lor estate did not rely upon the statements made by defendants' agent that decedent owned only a two-fifths interest in account No. 35, but, on the contrary, believed he owned a larger interest and only settled because of the financially embarrassed condition of the estate, and hence the judgment dismissing the bill was proper, since fraudulent misrepresentations, to furnish ground for rescission, must have been relied upon in making the settlement. Anderson v. McPike, 86 Mo. 293; Brown v. Leod, Co., 190 Mo. 681; Priest v. White, 89 Mo. 609.

LAMM, J.—Plaintiff sues in equity, the general object and nature of his bill is to set aside and annul a so-called "receipt or release" given by Bessie M. Taylor, executrix of W. J. Taylor's will, to the firm of Spencer and Dennison, to declare the same null and void because of fraud and to have an accounting.

At the close of plaintiff's case defendants demur to the evidence, the same is sustained, the court orders plaintiff's bill dismissed (which is done) and he comes up by appeal.

There are three questions here, viz.:

*First.* Is a demurrer to the evidence in the line of allowable procedure in equity cases?

*Second.* If so, must the party cast on such demurrer save an exception below to the ruling thereon in order to have a review of the merits on appeal?

*Third.* If there be no such exception saved in the bill of exceptions and if no such exception is necessary then was the bill well dismissed? (and herein of the merits).

A short history of the case is not amiss. The record shows that in September, 1903, and prior thereto, William J. Taylor and John F. Wright were dealing in "puts" and "calls" as partners in the grain commission business in Chicago. They were members of the board of trade. At that same time Corwin H.

Spencer and Uriah R. Denniston were in the same line as partners and members of said board of trade. Denniston lived, and had charge of the firm's office, in Chicago; Spencer lived in St. Louis. Though Taylor and Wright were partners, yet Taylor dealt in grain options on his own hook and, it seems, on joint account with others. On September 25, 1903, Taylor was run over by a railroad train and killed. His affairs were in a bad way. Among other debts, he owed Wright, his partner, forty or fifty thousand dollars. He died testate, leaving as his widow, Bessie M. Taylor. Nominated executrix of his will, she presently sued out letters of administration in the probate court of Cook county, Illinois, qualified as executrix and took upon herself the burden of settling the estate. After her husband's death and prior to her said appointment, Warren Pease was her personal attorney. After her appointment Pease was her attorney as executrix. He seems to have been equipped with zeal and ability in that behalf. Several "cards" were found on the person of Mr. Taylor at the time he was killed and several others were found in his papers in the office of Taylor and Wright, which cards came into her possession at once. They bore the caption numerals "35," and have figures, words and signs pointing to his trading in grain through Spencer and Denniston as his brokers on the boards of trade of Chicago and St. Louis, selling in one market for future delivery in May and December, and buying in the other for like delivery. On these cards were figures, abbreviations and cant trade words—among the latter, the words "long" and "short," long meaning *bought* and short meaning *sold.* It seems, speaking in brokers' idiom, that these deals were in the nature of "straddles" or "spreads" and that some of his trades were "open trades." It seems these cards did not bear Mr. Taylor's name, and that, barring the possession of these cards, he died leaving behind no memoranda or other evidence that he

was dealing in grain options through Spencer and Denniston. It seems, also, that it was customary for those dealing in puts and calls on the Chicago board of trade to get such cards with only numeral captions, the object being to conceal the identity of the person and possibly the state of his deals from those not initiated in the mysteries of option dealing and whose curious eyes might fall on the cards. Presently Mr. Pease applied to Denniston for information and was informed by him that Taylor had been dealing in grain through his firm as brokers, and that he had bought grain for May and December delivery on the St. Louis market and had sold for the same delivery on the Chicago market. The books of that firm showed three accounts. One was the joint account of three persons, each of them equally interested in the deals, viz., Taylor, Martin and Denniston; another was the joint account of Taylor and Martin; and another was the separate account of Taylor. This separate account bore the caption "35 special." The joint accounts as shown by the books were under the caption "35," and there were letters (viz. "T," "M" and "D") prefixed to the separate deals indicating the persons who were interested in them. There were earmarking memoranda on these books in ink and pencil. It appears that it was customary to designate an account and card by a number when the deals were joint as well as when individual. Mr. Pease called to his assistance a friend of Mr. Taylor, a Mr. Fyfe, an expert board of trade man, and a Mr. Bates, another expert of like ilk. Fyfe in the company of Pease examined the books of Spencer and Denniston. Those books showed the individual account, "35 special," had been closed prior to Mr. Taylor's death, and that he stood indebted to Spencer and Denniston in the rise of three thousand dollars on that account. They also showed that joint account "35" was open, and that if at the time of Taylor's death such deals had been closed at prevailing market

prices no profit was coming to him therefrom. Presently, however, after the appointment of Mrs. Taylor as executrix, the market turned in favor of these deals, and in November, 1903, she through Mr. Pease demanded the deals be closed and that she be allowed to take down the profits for the benefit of the estate. Thereat there was a long negotiation. Neither the executrix nor Mr. Pease knew whether account ''35'' was a joint account, in part of Taylor, Denniston and Martin and in part of Taylor and Martin, or was the separate and exclusive account of Taylor. On that issue of fact hinged the amount due Taylor's estate. In that condition of things (and doubting the showing made by the books) they called on Denniston for proof and accepted the proof furnished, viz., the affidavit of a Mr. Bailey, bookkeeper of Spencer and Denniston and the oral statement of Mr. Denniston. If their statements were true Taylor had a third interest in the deals made by Denniston, Martin and Taylor on joint account, and a one-half interest in the deals made by Martin and Taylor on joint account. On this basis, on the 11th day of November, 1903, because of said favorable turn in the market, there was due Taylor's estate the rise of seventeen thousand dollars on account ''35.'' Deducting therefrom Taylor's indebtedness on account ''35 special,'' it left a balance due the estate of about fourteen thousand dollars. It was without money to litigate. The executrix had the cards found in Taylor's possession. She had the statements of Bailey and Denniston that account number ''35'' was a joint account. Pease her attorney and her expert friend Mr. Fyfe had free access to the books of Spencer and Denniston, and Fyfe examined them. Armed with all the information from those sources, and guarded by the advice of counsel learned in the law, and her expert friends Bates and Fyfe, it was deemed best by those interested in the Taylor

estate to settle the matter. The plan adopted was as
follows: The throwing of a large amount of wheat on
the St. Louis market to close the deals before the op-
tion time of delivery it was feared would demoralize
that market and unfavorably affect other deals there.
Accordingly Spencer and Denniston offered to take an
assignment of the interest of the Taylor estate in ac-
count number "35" and this offer was accepted.  To
this end the attorney for the executrix caused the con-
troversy and proposed settlement to be brought to the
attention of the probate court of Cook county by a peti-
tion.  That court heard the matter, advised itself and
by its order of record authorized the sale and settle-
ment.  Thereupon pursuant to such authority the ex-
ecutrix received the settlement price and executed the
following assignment and release (omitting exhibits,
which are mere itemized details of the accounts):

In consideration of the sum of $13,910.96, this day paid to
me, Bessie Taylor, executrix of the will of William J. Taylor,
deceased, and widow of said deceased, by Spencer & Denniston, a
firm composed of Corwin H. Spencer and Uriah R. Denniston, I,
the said Bessie Taylor, executrix of said will, do hereby sell,
assign and transfer to said firm of Spencer & Denniston the
three accounts, hereto attached, and all of the right, title and
interest of the estate of said William J. Taylor, deceased, and of
myself as the executrix of said will and as widow of said de-
ceased, therein, the first of said accounts marked Exhibit A,
containing a statement of certain closed trades in grain in which
said William J. Taylor's estate, said Denniston and William H.
Martin are interested; the second of said accounts marked Ex-
hibit B, containing a statement of certain open trades in grain
in which said William J. Taylor's estate, said Denniston and
said Martin are interested, and the third of said accounts
marked Exhibit C, containing a statement of certain open trades
in grain in which said William J. Taylor's estate and said
Martin are interested.

This assignment is made pursuant to an order of the probate
court of Cook county, and the purpose of it is to transfer abso-
lutely to said Spencer & Denniston the said accounts and all
moneys that are due or may grow due thereon or out of the
transactions therein referred to, and to confer upon the said

firm of Spencer & Denniston the entire property in and to said accounts and moneys and the proceeds and avails thereof.

Witness my hand and seal this 11th day of November, A. D. 1903.

(SEAL)                                                    BESSIE TAYLOR,
                                                                     Executrix.

The sale was afterwards duly approved by the said probate court, and the money received was distributed among the creditors.

Presently Mrs. Taylor made settlement and resigned as executrix and John F. Wright, said former partner of Taylor, was appointed administrator, d. b. n., c. t. a. Afterwards he settled as such administrator and was discharged. Afterwards he procured his discharge to be set aside and the administration was reopened by an order of said probate court. This was in 1905. Afterwards ancillary administration was begun in the city of St. Louis, and plaintiff, as public administrator of that city, was put in charge. Thereupon (Spencer having departed this life, and defendants being executors of his will) he instituted this suit against them on the theory that Taylor owned the entire interest in account "35" involving the purchase in one market and the sale in the other of 500,000 bushels of grain. That his profits in that deal on the 11th of November, 1903, were about three times what his executrix received, that his executrix was deceived into making the settlement and transfer by false and fraudulent concealments and representations of said Denniston, which said representations were made and procured to be made, for the very purpose of misleading her into believing the profits belonged partly to Martin, Denniston and Taylor, and partly to Martin and Taylor, instead of wholly to Taylor, as the very fact was. It is charged that these representations were made by her husband's brokers knowing them to be false, that they were made to. be relied and acted on by executrix, that they were relied and acted upon

and were the procuring and moving cause of the settlement and assignment. The bill, as said, prayed that the settlement in the form of a "receipt or release" be set aside, declared null and void and cancelled and surrendered, and that an accounting be had between the Taylor estate and defendants, executors of the will of Corwin H. Spencer.

To that bill defendants answered with a wealth of averment, but as the defense was not reached at the trial, other than as it appeared by the admissions of the pleadings and by plaintiff's own showing, it will not be necessary to burden the opinion with the allegations of that voluminous pleading. Suffice it to say it denied the fraud, admitted the settlement, its authorization and approval by the probate court, alleged good faith, truthful and full disclosures, pleaded payment of more than was due, etc., and made a full showing of the condition of the account, as appearing on the books of Spencer and Denniston.

The foregoing is a sufficient statement of the facts uncovered at the trial and of the scope of the pleadings. To it we may add that the bill of exceptions shows that plaintiff saved no exception to the ruling on defendants' demurrer to the evidence. In his timely and unsuccessful motion for a new trial he challenged defendants' right to a demurrer in an equity case, and, as another ground for a new trial, asserted that under the pleadings and proof, the decree should have been for plaintiff and that the bill was improvidently dismissed.

If there be other record facts helpful in determining questions raised, they will appear in the course of the opinion.

I. It is asserted by plaintiff's counsel that a demurrer to the evidence is unknown to equity trials. They cite no authority to the proposition in their brief and none in their printed argument, but put the mat-

ter somewhat on the premise that they are unable
to find any precedent for presenting a demurrer to
the evidence in an equitable proceeding.  On the other
hand, counsel for defendants say they gleaned closer
than their adversaries and cite us to cases in our own
reports as precedents.  [Anthony v. Building Co., 188
Mo. l. c. 718; Bank v. Simpson, 152 Mo. 638.]  But, as
presently seen, the cited cases amount to nothing more
than evidence that the thing, whether well or ill, has
been actually done, and has been tolerated.  They do
not amount to an adjudication that it was *well* done,
nor do they amount to a judicial exposition of the mat-
ter, nor the assertion of an established rule of prac-
tice grounded on the reason of the thing, or long us-
age.  We have, therefore, been put to our own re-
search and canvass of the matter, wherefrom our con-
clusion is that an instruction in the nature of a de-
murrer to the evidence at the close of plaintiff's case
in an equity proceeding is an anomaly, hence is not
good practice.  Because:

  (a)  In the first place instructions of any char-
acter are out of place in an equity suit.  At very bot-
tom and root an instruction is but advice to a jury,
or to the court sitting as the jury.  In a law case,
tried without the help of a jury, instructions fill the
useful office of showing on what theory of law the case
was tried.  In a law case, tried with the help of a jury,
instructions fill the essential office of telling the triers
of fact what principles of law are applicable under the
pleadings to the facts found by them to exist.  But in
equity the scene shifts and another condition springs.
In an equity case for the chancellor to give instruc-
tions is but for him to give advice to himself—he
merely talks the matter over with himself and tells
himself how to do.  Now as a case in equity on appeal
is heard *de novo* (barring a certain preference allowed
by the upper to the lower court in weighing oral testi-
mony and tagging it with a credit value) it is a mat-

ter of no concern whatever to the upper court what advice the lower court gave to itself; for bad advice or good advice *nisi,* (taken or rejected) is immaterial in equity on appeal.  On appeal the advice, as well as the *ratio decidendi,* are *drowned* in the decree and lost sight of—the question remains only on the decree itself. Therefore on appeal our bounden duty (when the judgment is duly challenged) is to see whether it did equity. If it did, that is the end of the matter.  If it did not, then upon our consciences is laid the burden of seeking equity and doing it ourselves.  Accordingly it has been held that even if the chancellor call a jury in an equity case, the finding of the jury is merely advisory (Shaffer v. Detie, 191 Mo. l. c. 388); he can follow or reject that advice as he sees fit (Lewis v. Rhodes, 150 Mo. l. c. 501).  It follows that the instructions the chancellor gives the jury, when bad, are mere harmless error.  To use an adage of the ancients, they are mere goat's wool—*i. e.,* things of no pith.  This, since if he give bad advice to the jury and get bad advice back (a natural result) the thing amounts to nothing.  It is a tempest in a teapot; for he can reject the jury's bad advice, and notwithstanding the same do equity by his decree.  [Hall v. Harris, 145 Mo. 614; Bouton v. Pippin, 192 Mo. l. c. 474.]

*A fortiori,* if the chancellor (absent a jury) give instructions to himself, and they are wrong, error cannot be predicated of the giving of them, because he can still go on and decide the case right.  On the other hand, if the instructions be good, and the decision bad, it ought not to stand on appeal.  It follows that instructions in an equity case amount to nothing.  So, the mere action of the chancellor in giving or refusing them likewise amounts to nothing.  If that be so, then an exception to the action of the chancellor in giving an instruction in the nature of a demurrer to the evidence in an equity case amounts to nothing.

In this aggregation of nothings, the maxim applies: Out of nothing, nothing comes.

Hence the general rule is, that error (so called) in giving or refusing instructions in an equity case is no error at all; for such instructions, or such exception to them, will not be considered on appeal. [Wendover v. Baker, 121 Mo. 273; McCollum v. Boughton, 132 Mo. 601; Hall v. Harris, supra; Shaffer v. Detie, supra; Conran v. Sellew, 28 Mo. 320; Ellis v. Kreutzinger, 31 Mo. 432.]

A demurrer to the evidence being akin to a peremptory instruction, or an instruction in the nature of a demurrer, comes, we think, within the reason of the foregoing rule. It fills no such office in an equity case that error can be predicated on the mere giving or refusing of it. The court's action stands in the nature of a *finding of facts,* and the reversible error, if any, lurks in the judgment itself.

(b) In the second place (and heading to the same conclusion just announced) in some instances demurrers to evidence have been assigned an office by appellate courts, yet it will be found to be that of a mere convenience; that they in effect always cut behind the demurrer, as a demurrer, search the record on the merits and sustain or reverse the judgment because the judgment itself did or did not do equity.

In other cases demurrers to the evidence in equity cases have been held to be "novel" or "anomalous" and out of place. For example: Baker v. Satterfield, 43 Mo. App. l. c. 594, was in equity. In that case defendants interposed a demurrer to the evidence which was sustained over plaintiff's objection. On appeal time was spent in argument in charging error to that ruling. In reply to that contention, that court said: "If this was an ordinary action at law, then there would be some point in this contention. But, since it is a suit in equity, a demurrer to the evidence is improper. Instructions in such a case are entirely

immaterial.'' In that case the court treated the demurrer as of no consequence and went directly to the merits.

In Leeper v. Bates, 85 Mo. 226, at the instance of defendant the court sustained a demurrer to the evidence, and following that dismissed the bill. On such phase of the case the court said: ''In equity proceedings, a demurrer to the evidence is, perhaps, novel. But if the petitioner makes no case, the chancellor need not call upon the other side for a showing; he may at once dismiss the bill. And sustaining a demurrer to the evidence may not, under our practice, be an objectionable method of doing this. But this appeal depends upon another question.'' Thereat the court passed from the demurrer to the merits.

In Healey v. Simpson, 113 Mo. l. c. 345, a demurrer was sustained to the evidence in an equity case. In speaking to that point this court said: ''It is difficult to perceive what office a demurrer to the evidence in an equity case performs.'' We then went on to treat the case as disposed of on its merits, and because the court improperly dismissed the bill, following its ruling on the demurrer, the judgment was reversed.

Anthony v. Building Co., 188 Mo. 704, was an equity case in which the court sustained a demurrer to the evidence, but it was held on the record here that the judgment entry (which by the way, is the same entry we are dealing with in this case, viz., ''Demurrer to the evidence is sustained and the bill dismissed'') meant no more than that on the evidence the bill was dismissed for want of equity in the case. In that case, there was a colloquy between court and counsel, preserved in the bill of exceptions, showing the court construed his judgment to mean that the bill was dismissed on its merits. In the instant case the court put a like construction on the judgment by a narration in the bill of exceptions, as follows: ''Thereupon the

court . . . announced that the demurrer to the evidence would be sustained and the bill would be dismissed and a judgment and decree entered for defendants dismissing plaintiff's cause on the merits.''

Bank v. Simpson, 152 Mo. 638, an equity case, rode off on a demurrer to the evidence. The question of practice was not discussed, but a close gloss shows that we considered a dismissal of the bill below, following the chancellor's ruling on the demurrer, was equivalent to a finding on the facts, and that the bill was dismissed for want of equity.

In Hiss v. Hiss, 228 Ill. l. c. 421, it was ruled that: ''Where issues of fact in a chancery case are tried by the chancellor, the parties not being entitled to a trial by a jury as a matter of right, a demurrer to complainant's evidence is anomalous to the practice. . . . The demurrer of that character interposed in this case should not have received the consideration of the court.'' Thereat, putting aside the demurrer, the court took up the question whether the case made on plaintiff's evidence had equity in it. The pronouncement of the Hiss case is incorporated in the text of 38 Cyc., p. 1945.

In the foregoing view of it, the same conclusion follows announced in subdivision ''a'' of this paragraph of the opinion, namely, that on appeal the demurrer is immaterial, hence the exception thereto is immaterial, where the judgment itself is assailed as without equity.

The sum of the whole matter is this: While in some cases we have considered demurrers to the evidence in equity cases and have ruled on exceptions saved to giving them, yet such demurrers and such exceptions are not vital to a consideration of the merits (where the merits are here on another exception) and, when we have thus considered them, we have put the matter on the foot of a finding of facts below

whereby a judgment results dismissing the bill on the merits.

II. The next question is this: Is the case here on its merits? We hold it is. The record shows that in due time plaintiff filed a motion for new trial. In that motion he challenged the judgment, in that it was for the wrong party, was inequitable and contrary to the evidence. His motion was overruled and he saved an exception. In this condition of things, we rule that motion and exception bring the case here upon its merits in spite of the fact that a demurrer to the evidence was sustained below and no exception was saved thereto. This ruling inevitably follows as a sequence from the rulings made in subdivisions "a" and "b" in the first paragraph of this opinion. We are glad to reach such conclusion, on the reason of the thing, on an interesting question of equity practice. It accords with the equity maxims: Equity looks to substance, not form. Equity proceeds in accordance with what is good and right (*ex aequo et bono*).

Indeed, conscience and the very merits of a matter are inseparably joined by the eternal verities, the nature of things, and in administering equity, pure and undefiled, we may adopt as a cardinal rule the commandment of the marriage ritual, viz.: Whom God hath joined together, let no man put asunder. And to prevent that untoward result, the saying of PHILIPS, Com'r, in Noble v. Blont, 77 Mo. l. c. 239, anent the conservatism of our courts which "would not sacrifice the ends of justice upon the sharp edge of technicality," is apposite.

The premises considered, the point of respondents' counsel, that the merits are not here for review, is disallowed.

III. Of the merits. The facts sufficiently appear in the forepart of this opinion. Rescission is asked

238 Sup.—7

of an executed contract of sale. The right to rescission is put upon the foot of fraud. The fraud is charged to be certain alleged false representations made to the personal representative of the Taylor estate, who was ignorant of the truth. It is charged that such representations were made to be relied on and were relied on, whereby that estate was defrauded out of large profits in account "35"—the theory of the bill being that Taylor at the time of his death owned the whole account, and that is the theory of appellant on this appeal.

As I see it, the case is without equity. Because: False representations were the pegs on which the pleader hung his fraud. Without such there was no fraud. Without fraud there was no right to rescission. Without the right to rescission there was no right to an accounting, and no case. Now, no witness testified to any false representations or deception, or to any facts from which they could be inferred. There was no documentary testimony tending to show such. There was not a scintilla or iota of testimony that Taylor owned an interest in account "35" save what the books of Spencer and Denniston showed he owned. There was not a line, scrap, patch or shred of memoranda tending to show any such ownership. There was no proof of any fraudulent concealments. The personal representative of the estate had access to the brokers' books. Those books told their own story to the experts assisting the executrix and her attorney. Conceding, for the purposes of the case, that the representations of Denniston, the books and bookkeeper were relied on, yet there is nothing to show them jointly or severally unworthy of reliance. At the trial plaintiff had the same information the executrix had nearly five years before when she took $14,000 of Spencer and Denniston's money and made the transfer, and not a whit more. Armed with that information and the advice of her learned counsel and expert

friends she settled the matter under the eye and auspices of the probate court. On the very information she had then, and on which she settled and made her transfer, the present administrator asks a chancellor to rip up the settlement. It will be interesting to examine the theory on which that request is pressed.

It is argued, as we grasp it, that the books of Spencer and Denniston were partly in ink and partly in pencil, that such fact threw a suspicion on the integrity of those books and calls for explanation. But if that be a suspicious circumstance the executrix was not deceived thereby. She saw that condition at the outset, and long before she made her adjustment. Now, knowledge prevents deception. It cures the ills of deception; for *he who knows all cannot be deceived.*

Moreover, a question about those entries arose on those books before the settlement and transfer. The executrix wanted to know whether the entries, tending to show that Mr. Taylor was a joint owner in the account instead of the whole owner, were made on the dates set down and cotemporaneously with the thing itself, or were made at a later time. She was curious in that behalf. She took time to consider. She called for and got an affidavit of the bookkeeper, and on the showing made by him, on her own investigation, on representations by Denniston, on the state of the books, on the advice of counsel and expert friends, she rested satisfied. She went further. Out of abundant caution, she got the probate court's authority to settle, and pursued it. Years afterwards, when one of her husband's brokers had died, the estate put a new hand at the bellows and goes into court of equity through a new administrator and seeks to rescind the settlement and transfer. On new facts, or on a new discovery? Not at all—on the same old representations, the same ancient investigations, the same old books and on a state of things in all respects precisely as things were when the estate negotiated, settled, re-

ceived its money and made its transfer in 1903. We cannot very well write the law to be that a party is entitled to rescind under such circumstances. Equity delights in amicable adjustments. Equity will not disturb the repose and peace flowing from a settlement except its jurisdiction is invoked, in favor of one without knowledge at the time, by satisfactory evidence of deception, fraud or mistake.

Another theory of appellant's learned counsel seems to be that the possession by Taylor of the cards issued by the brokers made a prima facie showing in his favor that he owned the whole of account "35." That those cards in his possession raised a presumption he was such owner. On such premises, it is argued that plaintiff made a prima facie case of fraud in the settlement. But we see nothing warranting us in making any such presumption of fact or in our allowing such stress on a prima facie case of ownership, as would make the case break on that point. We have reached this conclusion because the cards, in and of themselves, are colorless and neutral on the fact of ownership and *quantum* of interest. They do not speak of this, that or the other interest in account "35." The mere possession of the cards is of little significance. At most they would furnish a clew leading up to a discovery of the facts in the books and, disconnected from the books, the cards were no probative evidence of ownership. The fact is that cards bearing numerals were issued and received for the identical purpose of concealing the identity of the dealer. The fact also is that such cards were issued when several were dealing on joint account. Another fact is that the cards and the books must be taken together to interpret the cards and identify the owners of the account. As heretofore pointed out, things were arranged in that way designedly as a screen of concealment. Finally, if we allowed the possession of the cards to make a prima facie case of full ownership, yet such ownership

was successfully rebutted by the books. Such prima facie case, if any existed, existed and was known at the time of the settlement. Wherefore, absent actual fraud, the matter stands foreclosed.

Something is made in argument of the relations existing between a broker and his customer. It is insisted that such relation is a confidential one, fiduciary in character, and that a broker carries the burden of showing that his dealings with his customer were fair. But does the broker not discharge that burden, when, as here, he makes settlement with his customer and enters into a solemn contract importing such settlement and transfer of the subject-matter of the account? If that were not so, then all plaintiff had to do in this case was to prove the relationship, prove dealings, prove the settlement and stop, for defendants thenceforth carried the burden of proof. In that theory the fraud, which is the gist of the action, would be presumed from the relationship of broker and customer and proof of dealings and settlement, and the burden of disproving fraud would be cast upon the broker. We cannot very well write the law that way. *Contra,* plaintiff pleaded the fraud and carried the burden of proving it. He who alleges has the *onus probandi.*

The rule is that fraud is never conjectured. As an eagle does not catch flies, so equity deals not with mere trifles in a search for fraud. Small things may show it, if, when put together in their natural relation, they point indubitably to it. Fraud is never presumed except there be facts shown from which it can be inferred. It does not rest on mere suspicion. The precept is that one is not permitted to give weight to smoke, and suspicion is but smoke. He who asserts fraud, as said, must prove fraud. It may be difficult to prove, but that difficulty does not dispense with the necessity of the proof. There was once a rule in Venice that a charge, even if anonymous, placed in the

mouth of St. Mark's lion (said lion being a statue there) cast the burden on the person named to disprove the charge. But the rule does not obtain among people possessing refined ideas of justice. In investigating a charge of fraud, courts of equity, as do courts of law, assume men are honest and act from correct motives, until the contrary is shown. So much as that is due to the dignity of human nature. It is said that those dealing in grain options on boards of trade are classified as "bears," "bulls" and "lambs." But we take it that, however they masquerade as animals, in trade cant, or in a Pickwickian sense, they are still *men* for judicial ends, and are entitled in the first instance to a presumption of honesty. The doctrine of original sin is not applied in chancery. We recall no case declaring the law otherwise up to this time.

So far as we can see, account "35," worthless on the death of Taylor, became of some value on a favorable turn of market, and was transferred for full value to Spencer and Denniston on the 11th day of November, 1903, on full and truthful disclosures and on an exhibit of the books of the firm. So far as we can see, Spencer and Denniston were not obliged to close the account on that day; for, under the terms of the deals, the trades were open trades for future delivery. Whether on the contract day of delivery there would have been any profit in those deals is not disclosed. The trades were closed voluntarily on demand of the executrix. The settlement thus made is in nowise impugned by the testimony. Equity does not proceed in a revengeful or whimsical mood in ripping up executed contracts. Equity extends her right hand to the deceived and wronged. She desires above all things that they have restitution, but in our case the estate of Taylor was not wronged or deceived. And while "equity delights in a quick show of clean hands" (*Per* DeArmond, Com'r, in Leeper v. Bates, 85 Mo. 224) yet

such showing was once made and the proof here did not call for another showing.

The judgment below was right; accordingly it is affirmed. All concur.