HOUSTON E. COPELAND, Appellant, v. AMERI-
CAN CENTRAL INSURANCE COMPANY, Re-
spondent.

St. Louis Court of Appeals, June 8, 1915.

1. **APPELLATE PRACTICE: New Trial: Remarks of Trial
Court: Review.** An appellate court will not interfere, where
the court below has refused to grant a new trial because of
remarks of the court in the hearing of the jury, alleged to have
been prejudicial to the complaining party, unless it is con-
vinced, from an examination of the whole record, that the
remarks were of such a character as to constitute prejudicial
error.

2. ———: ———: ———: ———. The matter of granting
a new trial on account of remarks made by the trial court
during the trial rests almost exclusively within the sound dis-
cretion of that court, and hence, although such remarks are
not such as would have justified the appellate court in reversing
the judgment, had the motion for a new trial been overruled,
nevertheless where the trial court grants a new trial on account
thereof, such order will not be interfered with, or appeal, unless
the trial court palpably abused its discretion in making it.

3. ———: ———: ———: ———. On appeal from an order
granting a new trial on account of remarks made by the trial
court during the trial, *held* that, although the remarks were
not such as would have justified a reversal of the judgment,
had the motion for a new trial been overruled, nevertheless it
was within the power of the trial court to grant a new trial on
account thereof, and, in view of the fact that the evidence
was evenly balanced and that the verdict was concurred in by
nine jurors only, the appellate court could not say that the trial
court palpably abused its discretion in granting a new trial.

4. **FIRE INSURANCE: Defenses: Fraud and Deceit: Sufficiency
of Evidence.** In an action to recover the amount of a draft
drawn by defendant fire insurance company, payable to insured
and by him indorsed and delivered to plaintiff, in payment of a
claim under a fire insurance policy issued by defendant, which
draft defendant thereafter declined to pay, defended on the
ground that plaintiff and others had conspired together for the
purpose of acquiring properties with the view of procuring fire
insurance thereon, grossly in excess of the value thereof, caus-

ing the same to be destroyed by fire, and collecting insurance thereon, and that, pursuant to such conspiracy, plaintiff and others acquired the property described in the policy issued by defendant, procured fire insurance thereon, including the policy issued by defendant, grossly in excess of the value of the property, and caused the same to be destroyed by fire, evidence *held* sufficient to warrant the submission of this defense to the jury.

5. **FRAUD AND DECEIT:** Establishment: Evidence. Since the law presumes that men are honest and actuated by correct motives, fraud is never presumed, and evidence which merely raises a suspicion of fraud will not suffice as proof of the existence thereof; but it is entirely legitimate to infer fraud from surrounding facts and circumstances which point directly to its existence.

6. ————: ————: ————. In a civil case, where plaintiff's fraud is set up as a defense, it is not necessary that proof of his guilt be such as would be necessary to convict him of a crime.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

AFFIRMED AND REMANDED.

*H. A. & C. R. Hamilton, Thomas J. Rowe* and *Seneca C. Taylor* for appellant.

(1) Remarks made by the trial judge are not ground for granting a new trial, unless they are made improperly and are of a character to prejudice the jury against one of the parties. State v. Teeters, 239 Mo. 475; Hutchinson v. Richmond Safety Gate Co., 247 Mo. 71; Farrar v. Railroad, 249 Mo. 210; Landers v. Railroad, 134 Mo. App. 80; Tuck v. Traction Co., 140 Mo. App. 335; Steltemeier v. Barrett, 145 Mo. App. 534. (2) There is no substantial evidence in the record to sustain the affirmative defense set forth in the answer and a verdict for defendant would be unsupported by proof. State v. Jones, 106 Mo. 302; State v. Morney, 196 Mo. 43; Spencer v. Ins. Co., 79 Mo. App. 213; Spiro v. Transit Co., 102 Mo. App.

250; American Ins. Co. v. Smith, 73 Mo. 368; Glover v. Ins. Co., 130 Mo. 173; Monaghan v. Ins. Co., 53 Mich. 238; Decker v. Ins. Co., 66 Me. 406; Boyd v. Glucklich, 116 Fed. 131; Pauley v. S. G. & L. Co., 131 N. Y. 90; Yaggle v. Allen, 48 N. Y. Supp. 827; Haywood v. State, 43 So. 614.

. *George L. Edwards* and *A. H. Roudebush* for respondents.

(1) The conduct of the trial judge fully justified him in granting a new trial. Simon v. State, 117 S. W. (Tex.) 143; Hutchinson v. Richmond Safety Gate Co. et al., 247 Mo. 71; Wright v. Richmond, 21 Mo. App. 76, 81; Dreyfus v. Railroad, 124 Mo. App. 594; I Thompson on Trials (2nd Ed), section 219; Hinzman v. Railroad, 182 Mo. 611. (2) Appellate courts will lean toward affirming rather than reversing orders granting new trials. Rickroad v. Martin, 43 Mo. App. 597; Parker v. Britton, 133 Mo. App. 270; Schmidt v. Railroad, 149 Mo. 269. (3) An appellate court may, in passing on the weight of the evidence, consider any points made in motion for a new trial, though not assigned by the trial judge as grounds for granting a new trial. Emmons v. Quade, 176 Mo. 22; Dale v. Golden Rod Mining Co., 110 Mo. App. 317; Chandler v. Gloyd, 217 Mo. 394; Hawman v. McLean, 139 Mo. App. 429; State ex rel. v. Thomas, 245 Mo. 65; Roney v. Organ, 176 Mo. App. 234. (4) Where a trial judge grants a new trial on the ground of his own conduct, his order will be treated by the appellate court as a matter of discretion, and not disturbed. Septowski v. St. Louis Transit Co., 108 Mo. App. 307. (5) Fraud can be established by circumstantial evidence and the weight of the evidence in this case is against the plaintiff. Cooley on Torts, 475; St. Francis Mill Co. v. Sugg, 206 Mo. l. c. 155.

ALLEN, J.—This is an action to recover the amount of a draft drawn by defendant upon itself, payable to one Blockburger and one Taylor, trustee, and by them indorsed and delivered to plaintiff, in payment of a claim upon a policy of fire insurance issued by defendant; which draft defendant thereafter declined to pay. This is the second appearance of the case in this court. The first trial resulted in a judgment for the defendant which was reversed by this court, on the former appeal, for error in giving an instruction. [See Copeland v. Insurance Co., 158 Mo. App. 338, 138 S. W. 557.] Upon the second trial, before the court and a jury, there was a verdict for plaintiff, but the court set it aside and granted defendant a new trial. From the order granting a new trial plaintiff prosecutes this appeal.

The pleadings upon which the second trial was had are the same as set out in substance in the opinion of this court on the former appeal. When the case was called for trial defendant, in open court, admitted liability on the second count of the petition, upon which plaintiff had elected to stand, for the amount therein demanded, unless it establish its affirmative defense set up in the answer. This affirmative defense is that long prior to the issuance of the policy of insurance, and at all of the times referred to in the answer, plaintiff and others had combined and conspired together for the purpose of acquiring properties and equities in properties with a view to procuring fire insurance thereon, grossly in excess of the value thereof, causing the same to be destroyed by fire and collecting insurance thereupon; that pursuant to such combination and conspiracy, plaintiff and others acquired the property described in the policy issued by defendant, procured fire insurance thereon, including the policy issued by defendant, grossly in excess of the value of the property, and caused the same to be destroyed by fire. And defendant averred

that it had issued the above mentioned draft in ignorance of the matters so pleaded in defense.

The defendant, to sustain the burden cast upon it to establish its affirmative defense, called plaintiff as the first witness, later calling Blockburger and one Dunaway, these being the three persons chiefly concerned in the transaction leading up to the procuring of the policy of insurance issued by defendant. The defense rests in large measure upon the testimony of these adverse witnesses who, as defendant contends, conspired to fraudulently obtain and did obtain insurance upon the property in question, grossly in excess of its value, and caused it to be destroyed by fire; though other evidence was adduced by defendant to support the averments of its answer.

It appears that on or about March 4, 1909, Dunaway acquired a piece of real property in St. Louis county, perhaps a mile or more from the corporate limits of Ferguson, known as the January homestead. The property consisted of approximately twenty-seven acres of land with a large residence thereon, which appears to have been originally a costly and handsome structure, but which was then old and out of repair. It had not been occupied for some years, except by a caretaker. Dunaway purchased the property through the Mississippi Valley Trust Company of St. Louis, a corporation, the agent of the owners thereof, for the sum of $13,500. He represented himself as the agent of one Guy S. Sturges to whom he caused the property to be conveyed. Sturges, however, was but a "straw man." At the time, the property was encumbered by a first deed of trust for $8000. There was also a second deed of trust of record thereon for $7000, but it appears that this did not represent an actual loan upon the property and was controlled by the owners. Dunaway paid in cash the difference between the amount of the first deed of

trust and the said purchase price, less certain commis-
sions allowed him in the transaction.

On March 19, 1909, Dunaway caused the title to
the property to be transferred by Sturges, by war-
ranty deed, to George O. Blockburger, the considera-
tion expressed in the deed being $25,000. In the
meantime a deed of trust had been executed to one
Frank X. Hackman to secure a principle note of $15,000
and interest notes. Dunaway testified that he had ar-
ranged with Hackman to make such loan before he
had completed his purchase of property, telling Hack-
man that it was to take up an encumbrance of like
amount then on the property. It is said, however,
that Hackman found himself unable to make a loan
to this extent and that in lieu thereof he advanced
$7,000, leaving the first deed of trust for $8,000 on
the property, his deed of trust becoming a second
lien. Plaintiff, Dunaway and Blockburger, by their
testimony, seek to make it appear that Blockburger
purchased the property from Dunaway in good faith,
for the price of $25,000, paying in cash $10,000 for the
equity above the original mortgage for $8,000 and the
Hackman mortgage for $7,000; Blockburger procur-
ing from plaintiff, Copeland, $5,000 secured by a third
deed of trust upon the property, to aid him in mak-
ing the payment of this $10,000.

Plaintiff, Dunaway and Blockburger claim to
have met at plaintiff's residence in the city of St.
Louis where Blockburger's purchase was consum-
mated. According to their version of the transac-
tion, some paper showing title in Sturges was shown
plaintiff, together with a warranty deed from Stur-
ges to Blockburger; plaintiff paid over to Blockbur-
ger $5,000 in currency, receiving a third deed of trust
upon the property, though he says that his previous
understanding was that his was to be a second mort-
gage; and Blockburger in turn paid Dunaway the
$5,000 received from plaintiff together with the fur-

ther sum of $5,000, likewise in currency, to complete the purchase.

It is defendant's contention that this transfer to Blockburger was a mere sham, as were also the pretended loans of plaintiff and Hackman; that no consideration ever passed in any of these transactions, and that they were carried out on paper for the purpose of making it appear that there was a large equity in this property (which was untrue) in order to procure additional insurance upon the improvements; the whole being a scheme to defraud, and being but a part of a conspiracy to acquire equities in properties improved by old buildings, and, through the placing of fictitious loans thereon, to secure insurance far in excess of the value of the improvements, and then cause the buildings to be destroyed by fire.

Though plaintiff had a small bank account, and had, at various times, accounts with different banks, the $5,000 claimed to have been paid by him in making the loan upon this deed of trust was not deposited in bank. He claims to have had the amount on hand in currency. Likewise Blockburger, though he had an account at a bank, where he had, as he says, but little on deposit, and who likewise had kept accounts with other banks, did not have on deposit the additional $5,000 claimed to have been paid by him in currency when he purchased the property. Each claimed to have saved and accumulated such sum in currency. Likewise Dunaway could not tell what had become of the $10,000 claimed to have been so paid him for the putative equity in the property. He did not deposit it in bank. He at first said that his recollection was that he took the money to his home. Then he stated that he thought that part of it had been put in a safe deposit box and a part left with Hackman. Finally he says: "I don't know what I did do with the money." At any rate there is no evi-

dence of any such sums of money, except the testimony from the lips of these three witnesses.

It appears that prior to the acquisition of the property by Dunaway, and until after the transfer to Blockburger, the insurance thereon was only $8,000—sufficient to cover the amount of the original first deed of trust. After the transfer to Blockburger and the placing of the additional deeds of trust of record, insurance was procured thereon by Blockburger in the total sum of $20,000. This included the policy for $5,000 issued by defendant and here involved. Blockburger was named therein as the insured, but attached thereto, and made a part thereof, was the usual mortgage clause whereby the loss, if any, was made payable to S. C. Taylor, trustee, as his interest might appear; Taylor being the trustee in the deed of trust held by plaintiff. On or about May 19, 1909, some time after midnight, the building was totally destroyed by fire.

Blockburger testified that he was preparing the building for use as a "club house;" that he had been doing certain painting therein, and had moved in certain personal property; that his brother, one Harry Blockburger, and one Shilling "had been staying there all the time sleeping in the property," but that no one was at the house when the fire started. That night plaintiff and Blockburger were together at a card party in the city of St. Louis. Blockburger admitted that a few days prior to the destruction of the house he had received four notices of the cancellation of other insurance policies on this property, such notices being to the effect that within a certain time the insurance companies issuing the notices would cancel the insurance; and that the fire occurred before the expiration of the time mentioned in such notices.

Plaintiff testified that upon learning of the fire he turned his "papers" over to Blockburger who placed the claim in the hands of an insurance adjuster.

On August 11, 1909, defendant caused the draft in question to be issued, and it was endorsed by Blockburger and Taylor, trustee, delivered to plaintiff, and by him deposited in bank. Plaintiff thereupon drew a check against such deposit for the sum of $5,000, the amount of the draft, payable to Dunaway, and delivered it to the latter. The explanation of this given by plaintiff and Dunaway is that it was done pursuant to a prior agreement that plaintiff would lend this sum to Dunaway secured by a mortgage on some land in Tennessee.

From testimony of competent real estate dealers, adduced by defendant, it appears that the entire property was not worth more than thirteen or fourteen thousand dollars, and that the value of the building did not exceed five or six thousand dollars. Opposed to this is the testimony of two local builders produced by plaintiff, but who do not appear to have been qualified to give expert opinions as to real estate values, who placed the value of the building at from $20,000 to $25,000.

There is much testimony in the record, pertaining not alone to this transaction but to others of a like character in which Dunaway figured, plaintiff being a party to one of them, Hackman being concerned with another, and there being evidence to connect Blockburger (alias George Scott) with a third. The evidence pertaining to the merits, however, need not be here further detailed.

Defendant's motion for new trial, among other things, charges that the court committed error in making prejudicial comments during the trial of the case, setting out the same. The court sustained the motion upon the ground, as stated in its order, "that the court, during the trial, made certain comments, and by its manner at the time, in making one of them, is likely to have prejudiced the jury against the defendant."

During the examination of plaintiff by defendant's counsel, plaintiff was being questioned with respect to the state of his bank account at and about the time of the depositing of the draft by him. It appears that on July 7, 1909, his bank book was balanced showing a balance in his favor of $243.89; and that on July 23d he made a deposit of $50. The record shows that while defendant's counsel, Mr. Edwards, was examining him as to the amount which the bank book showed to his credit, the following occurred: The Court: "Introduce the book in evidence if you want to." Mr. Edwards: "I want to see if he can figure it up." A. (The witness): "I ain't no bookkeeper." The Court: "Don't you think this man can add up two or three figures?" Mr. Edwards: "Yes." The Court: "Add that up, take a pencil and add that up." (Tosses his pencil to witness.)

It is this occurrence at the trial to which the court has reference in its order when it says that the court's manner (towards defendant's counsel) may have been such as to prejudice the jury against the defendant; though in the court's memorandum filed in passing upon the motion reference is made to another remark made by the court in the course of the trial, complained of and set out in the motion. The latter occurred when an objection to a question was interposed by plaintiff's counsel upon the ground that it pertained to an issue not tendered by the pleadings. In passing upon the objection the court said to defendant's counsel: "To permit you to show that might enable you to lay a trap for the plaintiff, omit to allege defense in your answer and when plaintiff comes into court unprepared, you could turn around and rely on some other defense than that set forth in your answer." Defendant's counsel objected to the court's remark saying: "There is no intention of laying a trap." Thereupon the court replied: "I did not say that you were laying a trap and did not mean to inti-

mate that there was anything dishonorable in your conduct.'' And the court then told the jury that what was said was not to be construed as a reflection upon defendant's counsel, and that the jury should not ''take it as in any way derogatory to defendant's counsel or defendant's case.''

The motion for a new trial complained of a further remark of the court in the hearing of the jury. At the close of the examination of witness Dunaway, a question was asked the witness by defendant's counsel pertaining to a matter that had been previously gone over. This being objected to, defendant's counsel said that he had forgotten what statement the witness had made as to the matter. The court thereupon said: ''Suppose you had a very poor memory and had forgotten all of his testimony, would you ask the whole thing be repeated?''

I. Appellant bitterly complains of the action of the trial court in depriving him of the benefit of a verdict, obtained as the result of a trial of considerable length involving no little expense to the litigants and the State, because of remarks by the court which it is said could not reasonably be supposed to have had the effect of influencing the jury against defendant. It is said that the remark to which the court referred in its order, and the accompanying action of the court in tossing a pencil to the witness, constituted a mere trivial incident, occurring in the earlier stages of the trial, which, if it had any slight effect upon the jury, was doubtless forgotten by them before the trial closed.

And in support of the contention that the conduct of the court during the trial was not such as to warrant the granting of a new trial, we are referred to the following cases upon which appellant relies, viz: Farrar v. Railroad, 249 Mo. 210, 155 S. W. 439; Hutchinson v. Richmond Safety Gate Co., 247 Mo. 71,

152 S. W. 52; State v. Teeters, 239 Mo. 475, 144 S. W. 445; Steltmeier v. Barrett, 145 Mo. App. 534, 122 S. W. 1095; Tuck v. Traction Co., 140 Mo. App. 335, 124 S. W. 1079; Landers v. Railroad, 134 Mo. App. 80, 114 S. W. 543. But these are all cases in which the appellate court declined to reverse a judgment on appeal because of alleged prejudicial remarks of the trial judge, where the latter had not seen fit to exercise his discretion in favor of granting a new trial. These authorities serve merely to illustrate the rule that an appellate court will not interfere where the court below has refused to grant a new trial because of remarks of the court in the hearing of the jury, alleged to have been prejudicial to the complaining party, unless the appellate court is convinced from an examination of the whole record that the remarks were of such a character as to constitute prejudicial error. Here the court, in the affirmative exercise of a broad judicial discretion reposed in it, has granted a new trial because of remarks and conduct on its part which the court deemed prejudicial to the rights of the respondent. And we are asked to reverse the court's order, made in the exercise of such discretion.

Though it be true that the court's remarks complained of in the motion for new trial are not such as would have justified us in reversing the judgment, had the motion been overruled, it does not follow that we should refuse to accord to the trial court the right, in the exercise of its discretion, to set aside the verdict because of what occurred at the trial. The trial judge knew not merely the language of the remarks made (which is necessarily all that we have in the cold record before us), but knew also his own manner and demeanor, and was in a position to judge of the probable effect of the same upon the jury, under the particular circumstances present and in view of the nature of the case on trial. This record upon its face does not disclose any conduct on the part of the trial court

of a character such as to constitute reversible error. But the trial judge, who knew his own accompanying actions and manner, and had the opportunity to observe the impression made upon the jurors, deemed his remarks and manner prejudicial to the respondent; and, impelled by a conscientious regard for the proper performance of his duty in the premises, granted a new trial on account thereof. In view of the fact that we do not occupy the favorable position that he did, to judge of the matter, we do not see how we could say that nothing prejudicial occurred, and that he abused his discretion in making the order appealed from.

In Septowski v. Transit Co., 108 Mo. App. 307, 83 S. W. 286, which was an appeal from an order granting a new trial because of remarks of the court, this court in an opinion by GOODE, J., said:

"Setting aside a verdict for the reason assigned in the present instance, must be classed with the same ruling when made because the verdict was against the weight of the evidence, and treated as so far within the trial judge's discretion that an appellate court will not disturb the order unless an abuse is palpable; which is not the case in this instance. In truth, that a judge thought he had made prejudicial remarks in the course of the trial which affected the jury, may more appropriately be treated as a matter of discretion than his view of the evidence. It is extremely unlikely that one will grant a retrial because of remarks in the hearing of the jurors, unless he observes something in their demeanor to induce the belief that harm has been done."

In this connection see also: Rickroad v. Martin, 43 Mo. App. l. c. 603, 604; Hutchinson v. Safety Gate Co., 207 Mo. l. c. 111, 112, 152 S. W. 52; Dreyfus v. Railroad, 124 Mo. App. l. c. 593, 594, 102 S. W. 53.

The court did not set aside the verdict as being against the weight of the evidence. On the contrary

in its memorandum the court says that it is not disposed so to do, adding: "It is because the issue is so close that the court feels that there was great likelihood that its language and actions may have turned the scales in favor of plaintiff." The action of the trial judge was predicated upon a survey of the case as a whole, as made by the evidence, and what he conscientiously regarded as the probable effect of his own remarks and demeanor as a factor contributing to the result. In this connection it may be noted that the verdict was by nine jurors, three refusing to sign it. While under our law a verdict by three-fourths of the jury, in civil cases, is now as binding as a unanimous verdict, the fact that but nine jurors concurred in this verdict is, we think, a matter which may properly be reckoned with in the appeal before us. Jurors are often quick to catch what they regard as some indication of the views of the trial court as to the merits of the action, and may be readily influenced by the betrayal of any hostile feeling on the part of the court toward a litigant or his counsel, or by anything which may convey the idea that the sympathy of the court is with one party. And a verdict such as this may result from an impression made upon the mind of one juror alone by inadvertent remarks or conduct of the trial judge.

The matter is one resting almost exclusively in the sound discretion of the trial judge. In order to reverse the ruling appealed from we must, at least, be prepared to say that the court palpably abused its discretion in granting a new trial. Under the circumstances we do not feel justified in so holding.

II. But appellant insists that there is no substantial evidence in the record to sustain the affirmative defense pleaded and sought to be established by defendant, and under the evidence adduced a verdict for defendant could not stand; that the court should have

directed a verdict for plaintiff; and that therefore its action in setting aside a verdict in plaintiff's favor should be reversed. It is very ably and forcibly argued that defendant's evidence does nothing more than create a suspicion of fraud on plaintiff's part. And great stress is laid upon the fact that there was no direct proof that the old January residence was willfully destroyed by anyone.

We have carefully considered the argument so advanced, and the authorities cited and quoted from in support thereof, but we do not regard defendant's evidence as constituting no substantial proof in support of its affirmative defense. Plaintiff's counsel evidently did not so regard it at the trial, for no demurrer was offered at the close of the evidence in support of such defense, though one was interposed at the close of all the evidence.

Undoubtedly the great weight of the evidence on the subject is to the effect that the building was in fact insured in an amount grossly in excess of its value. Indeed it is doubtful if there can be said to be any competent evidence to dispute this. The twenty-seven acres of land, together with the old house upon it, was doubtless worth no more than Dunaway paid for it, and the evidence almost conclusively so shows. It is safe to say that there was no "equity" above this, and it is extremely unlikely that the sale to Blockburger and plaintiff's mortgage were *bona fide*; and the facts and circumstances attending these transactions are such as to warrant the finding that they were conceived in fraud.

At the time of these transactions plaintiff was a barber, though he had formerly been a carpenter. He says that he also conducted rooming houses. George Blockburger had been a bricklayer, plasterer, and pool room keeper, and was a dramshop keeper at the time of the trial below. Dunaway, formerly a carpenter,

appears to have been a trader or dealer in properties of one sort or another. He was shown to have figured conspicuously in other transactions such as that here involved. In each instance the insurance was increased upon some old building, to cover an apparent equity, which from the evidence appears not to have been real, and within a short time the building was mysteriously destroyed by fire. In one of these plaintiff took a leading part. The property (the Murdock farm in St. Louis county) was transferred to him in 1908 by a dummy acting for Dunaway—after the latter, as here, had increased the encumbrance thereon for a consideration (according to the papers) approximately double the real value of the land and improvements as shown by expert testimony. Plaintiff claims to have paid $2500 in currency, and a deed of trust in the sum of $1000 held by him on other property, for the equity. The insurance was accordingly increased to cover plaintiff's equity, and shortly thereafter the building was mysteriously destroyed by fire. Plaintiff collected the insurance and at once issued a check to Dunaway for a thousand dollars. The giving of this check is attempted to be explained by testimony to the effect that plaintiff happened to meet Dunaway and the latter happened to have in his pocket the deed of trust received from plaintiff in the deal and that plaintiff repurchased it. Though this transaction was assailed at the first trial, plaintiff was here unable to produce any satisfactory evidence that such a deed of trust ever existed or to locate the property upon which it was supposed to have been a lien.

Plaintiff, though a man of business experience, but having little if any knowledge of real estate values in the community in question, consummated his part of the January transaction having seen the property but once, according to his testimony, without further inquiry or advice, and at a time when Blockburger had no title thereto, lending, as he claims, $5,000 in cur-

rency, the savings of years, upon a third deed of trust thereon. Blockburger, who is said to have parted with $5,000 in currency in purchasing the equity, could not tell whether he had visited the property once or twice before buying it. One Warren, the caretaker in charge of the property for the original owners, and likewise his wife, testified that plaintiff first came to see the property in the latter part of 1908, in company with Dunaway who introduced him as "Mr. Curtis;" that plaintiff, known as Curtis, came out again on March 17, 1909, in company with Blockburger, whom he introduced as "Mr. Sturges;" and that Blockburger, or Sturges as he was known, then announced that he had bought the property, though he had never been on it before.

It is true that real money has not ceased to be a medium of exchange, and that men often act incautiously and imprudently; but the acts of these parties and the surrounding circumstances, which speak louder than their own words, indicate that this was not a genuine money transaction, but one on paper only. It has the distinctive earmarks of fraud.

From all the facts and circumstances shown in evidence we think that a jury could well find that the January property was willfully destroyed as a part and parcel of an extensive conspiracy to defraud. Certain it is that the positive evidence is abundant to the effect that the property was insured in an amount grossly in excess of its actual value. And the circumstances surrounding the real estate transaction, the destruction of the building and plaintiff's attempted disposition of the proceeds of defendant's policy, when all elements thereof are considered, are such as to readily give rise to the inference that the whole was an iniquitous scheme to obtain the proceeds of insurance policies, consummated by the final act of causing the building to be fired—before the cancellation of certain policies thereon could become effective.

Since the presumption is that men are honest and actuated by correct motives, fraud is never presumed. Neither will evidence which merely raises a suspicion of fraud suffice as proof of the existence thereof. [See Troll v. Spencer, 238 Mo. 1. c. 101, 102, 141 S. W. 855; Cummings v. Parker, 250 Mo. 1. c. 439, 440, 157 S. W. 629; Troll v. St. Louis, 257 Mo. 653, et seq., 168 S. W. 167.] However, it is entirely legitimate to infer fraud from surrounding facts and circumstances which point directly to its existence. "Fraud is rarely ever susceptible of positive proof, for the obvious reason that it does not cry aloud in the streets not proclaim its iniquitous purposes from the house tops. Its vermiculations are chiefly traceable by covered tracks and studious concealments." [Massey v. Young, 73 Mo. 1. c. 273, 274; St. Francois Mill Co., v. Sugg, 206 Mo. 1. c. 155, 104 S. W. 45.] "Fraud, originating in oblique cunning, is often deeply laid away and may be got at alone by the keenest scrutiny, by acute probing and sometimes by the aid of indirection, a weighing and shifting of motives, and, again, the putting together of trivial circumstances may furnish persuasive evidence of fraud." [State ex inf. v. Standard Oil Co., 194 Mo. 1. c. 154, 155, 91 S. W. 1062.] "Very slight circumstances therefore, may, although apparently trivial and unimportant of themselves, afford, when combined together, irrefragable proof of fraudulent intent." [Hopkins v. Seivert, 58 Mo. 201; State ex inf v. Standard Oil Co., supra; Cummings v. Parker, supra.

This is a civil case, and it is not necessary that proof of plaintiff's guilt be such as would be necessary to convict him of a crime. Anything—by way of legitimate inference from facts shown in evidence—which satisfies the mind and conscience that the acts charged were perpetrated, and that plaintiff was a participant therein, ought to suffice to support the affirmative defense pleaded.

We think that the case is one for the jury.

The order granting a new trial will therefore be affirmed and the cause remanded. It is so ordered. *Nortoni, J.,* concurs; *Reynolds, P. J.,* concurs in the result and in all said as above, except as to a verdict by nine jurors. His understanding is that under our Constitution a verdict in a civil case by nine jurors is just as conclusive in the appellate court as if by twelve. Nor does he understand the opinion holds any other way. But to avoid any misapprehension of that, he desires to make this observation.